## ST. PAUL & SIOUX CITY RAILROAD COMPANY & Another *v.* WINONA & ST. PETER RAILROAD COMPANY.

IN ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

Argued December 18, 19, 1884.—Decided January 5, 1885.

In grants of lands to aid in building railroads, the title to the lands within the primary limits within which all the odd or even sections are granted, relates, after the road is located according to law, to the date of the grant, and in cases where these limits, as between different roads, conflict or encroach on each other, priority of date of the act of Congress, and not priority of location of the line of road, gives priority of title.

When the acts of Congress in such cases are of the same date, or grants are made for different roads by the same statute, priority of location gives no priority of right; but where the limits of the primary grants, which are settled by the location, conflict, as by crossing or lapping, the parties building the roads under those grants take the sections, within the conflicting limits of primary location, in equal undivided moieties, without regard to priority of location of the line of the road, or priority of construction.

A different rule prevails in case of lands to be selected in lieu of those within the limits of primary location, which have been sold or pre-empted before the location is made, where the limits of selection interfere or overlap.

In such cases neither priority of grant, nor priority of location, nor priority of construction, gives priority of right; but this is determined by priority of selection, where the selection is made according to law.

The facts which make the case are stated in the opinion of the court.

*Mr. E. C. Palmer* for plaintiff in error.

*Mr. Thomas Wilson* for defendant in error.

Mr. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Minnesota, and a motion is made to dismiss it for want of jurisdiction.

It will sufficiently appear in the opinion on the merits, that the rights asserted by both parties are founded on acts of Congress, and require the construction of those acts to determine their conflicting claims. The motion to dismiss, therefore, cannot prevail.

The source of this controversy is to be found in the act of Congress of March 3, 1857, 11 Stat. 195, making grants of land to the Territory of Minnesota and the State of Alabama to aid in the construction of railroads. The first section of this statute—the important one in the case—is as follows:

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there be and is hereby granted to the Territory of Minnesota, for the purpose of aiding in the construction of railroads, from Stillwater, by way of Saint Paul and Saint Anthony, to a point between the foot of Big Stone Lake and the mouth of Sioux Wood River, with a branch via Saint Cloud and Crow Wing, to the navigable waters of the Red River of the north at such point as the Legislature of said Territory may determine; from St. Paul and from Saint Anthony via Minneapolis to a convenient point of junction west of the Mississippi, to the southern boundary of the Territory, in the direction of the mouth of the Big Sioux River, with a branch via Faribault to the north line of the State of Iowa, west of range sixteen; from Winona via Saint Peter, to a point on the Big Sioux River south of the forty-fifth parallel of north latitude; also from La Crescent, via Target Lake, up the valley of Root River, to a point of junction with the last-mentioned road, east of range seventeen, every alternate section of land, designated by odd numbers, for six sections in width on each side of

each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of pre-emption has attached to the same, then, it shall be lawful for any agent, or agents, to be appointed by the Governor of said Territory or future State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which the rights of pre-emption have attached as aforesaid; which lands (thus selected in lieu of those sold, and to which pre-emption rights have attached as aforesaid, together with the sections and parts of sections designated by odd numbers as aforesaid and appropriated as aforesaid) shall be held by the Territory or future State of Minnesota for the use and purpose aforesaid; *Provided,* That the land to be so located shall, in no case, be further than fifteen miles from the lines of said roads or branches, and selected for and on account of each of said roads or branches; *Provided further,* That the lands hereby granted for and on account of said roads and branches, severally, shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever; *And provided further,* That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads and branches through such reserved lands, in which case the rights of way only shall be granted, subject to the approval of the President of the United States."

The Territory of Minnesota accepted this grant and conferred the right to the lands which came to it by means of its

provisions on certain railroad corporations, which failed to perform their obligations to the State; by reason of which, and by the foreclosure of statutory mortgages, the State resumed control of the lands. It is unnecessary to pursue the various steps by which it was done, but it may be stated shortly that the right to build one of the roads mentioned in the act of Congress, and to receive the lands granted in aid of the enterprise, namely, from St. Paul and St. Anthony, by way of Minneapolis, to the southern boundary of the State, in the direction of the mouth of the Big Sioux River, became vested in the St. Paul and Sioux City Railroad Company, the plaintiff in error in this case.

A similar right in regard to the road to be built from Winona *via* St. Peter to a point on the Big Sioux River, south of the forty-fifth parallel of latitude, and to the lands granted by the act in aid of it, became vested in the Winona and St. Peter Railroad Company, the defendant in error.

These companies have complied with the terms of the grant by Congress and by the Minnesota Legislature, and completed the construction of the roads which they undertook to build. They have also each of them, received large quantities of the land appropriated by the act of March, 1857, and by subsequent acts on the same subject, and, at one point where the lines of the two roads crossed, so that the grant of lands to each of the roads ran into the other's limit, the conflict has been settled by adopting the principle of an equal undivided interest in the lands so situated.

The present controversy has relation to another part of the general course of these roads, where the lines of their location, *not* approaching each other so close that the limits of six miles within which the alternate six sections are to be first sought for interfere with each other, but so close that the fifteen-mile limits, under the act of 1857, of selection for lands sold or pre-empted *do* overlap each other, as do also the limits of the extension of the grants under the acts of 1864 and 1865, to be hereafter considered.

It is in regard to the lands to be *selected* under all these grants, and chiefly in regard to the claim of the St. Paul Com-

pany, that, in search of its deficient lands *in place* (using that phrase for lands within six miles of its road), which had been disposed of before its location, it can, within its limit of fifteen miles under the original act, or its twenty miles under the subsequent acts, make those selections of odd-numbered sections within the six-miles limit of the Winona Company, that the present controversy arises.

The Secretary of the Interior, after a contest before the department between the parties to the present litigation, certified to the State of Minnesota, on May 14, 1874, a large quantity of lands, of odd-numbered sections, within the six-miles limit of the Winona road, as land properly selected by the St. Paul Company, to make up its deficiencies of lands within its own six-miles limits, and also to make up its deficiencies within the twenty-miles limits before referred to. A small part of these lands was within the fifteen-miles limits of the Winona road, and not within its six-miles limit.

Thereupon the Winona Company brought the present suit, in the proper court of the State, to have a declaration of its rights in the lands described in a schedule attached to the bill, as against the St. Paul Company and others, and to restrain them from receiving a patent, or other evidences of title to the lands, from the governor of the State.

The local court granted relief, but whether to the full extent of the prayer of plaintiff we do not know, for, while the judgment of that court is before us, with a specific description of the pieces of land which it declares to be rightfully owned by the Winona Company, the schedules referred to in the original petition are not in the record. From that judgment the St. Paul Company appealed to the Supreme Court of the State, where it was affirmed, and then prosecuted this writ of error to that judgment of affirmance. See 26 Minn. 179; 27 Minn. 128.

The judge of the District Court for Blue Earth County, in which the case was first tried, made an elaborate finding of the facts on which his judgment was rendered, and also an amended finding, and by these, so far as any controversy on the facts arises, the Supreme Court of Minnesota was governed,

and so is this court. These findings of fact are very full, and are intended to meet several aspects of the case, some of which are, in our view, immaterial to its decision.

The Supreme Court of Minnesota divides the lands in controversy in the suit into four classes, only the first two of which are in controversy here, namely:

First. Those lying without the six, but within the fifteen, miles limit of the defendant (the St. Paul Company), and within the six-miles limit of plaintiff (the Winona Company).

Second. Those lying without the six-miles limit of each company, within the fifteen-miles limit of plaintiff (the Winona Company), and without the fifteen, but within the twenty miles limit of the defendant (the St. Paul Company).

The decision of that court gave the lands embraced in both these classes to the Winona Company, and the St. Paul Company assigns for error here that it is entitled to both classes.

The act of March 3, 1857, is of the class of acts which this court has repeatedly held to be a grant *in præsenti.* Its language is " that there be, and hereby is, granted to the Territory of Minnesota . . . every alternate section of land designated by odd numbers, for six sections in width on each side of said roads; " and though the roads may not be located through these lands for several years, whenever the location is made the alternate odd-numbered sections are thereby ascertained, and the title then perfected relates back to the statute; and as to all such sections, or parts of sections, not sold, or to which a pre-emption right has not attached at the time of this location, the title is valid from the date of the act. There are perhaps other lands reserved by the United States and otherwise excepted out of the grant which do not pass, but these are not material to the decision of the present case.

In this act of March 3, 1857, and in the earlier act of May 15, 1856, granting lands to the State of Iowa for railroad purposes, and perhaps in other similar acts, Congress has, in a single statute, made provisions for several different roads, with different places of beginning and ending, and running in different directions. These roads have, in every instance, been built by different corporations, organized under State laws, having

no other connection with each other than this common source from which the lands are received, and the rights and duties arising under these acts of Congress and the acts of the State on the same subject.

In each and all of these cases the date of the title and the source of the title are the same, because they arise under the same act of Congress. It results from this that no priority of title can be obtained by the earlier location of the line of the road, provided this be done within the time limited for the forfeiture of the grant. Though one of the corporations to which the right to build a road and receive the grant has been given may locate its road two or three years earlier than another company authorized to build another road under the same grant, there is no priority of title nor any priority of right to the lands found in place within the six-miles limit by reason of this earlier location.

As we said before, the title to the alternate sections to be taken within the limit, when *all* the odd sections are granted, becomes fixed, ascertained and perfected in each case by this location of the line of the road, and in case of each road the title relates back to the act of Congress. *Missouri, Kansas & Texas Railroad Co.* v. *Kansas Pacific Railroad Co.*, 97 U. S. 491, 501; *Van Wyck* v. *Knevals*, 106 U. S. 360; *Cedar Rapids Co.* v. *Herring*, 110 U. S. 27; *Grinnell* v. *Railroad Co.*, 103 U. S. 739. In cases where these lines of road do not cross each other, nor the limits within which the lands in place are found do not cross or overlap, nor the limits within which lands in lieu of those sold or pre-empted are to be selected, this is a matter of no consequence.

But in the administration of these land grants of the same date, it has more than once occurred that, by reason of the lines crossing each other or the exterior limits of the lands in place coming so near as to overlap, the question of priority of right has arisen.

In such cases it has been insisted very earnestly that priority of location gave priority of right to all the lands coming within the six-miles limit of the road first located. Such is the argument of plaintiff in error in this case; and while there is here

no lap or collision of the six-miles limit of these two roads as located and constructed as to lands now in question, it is much insisted that, the appellant's road having been first located, this carries with it the identity of the limits within which indemnity lands may be selected for those sold or pre-empted within its own six-miles limit; and as this indemnity limit extends over a part of appellee's six-miles limit, it is urged that this selection, though made years after both roads are located and built, is a right paramount to any right the appellee has within that limit, unless it be the road-bed and right of way.

It is on this ground that the appellant here insists upon its right to enter the six-miles limit of the appellee's road wherever its indemnity limit of fifteen miles and its extension limit of twenty miles overlap the six-miles limit of the latter, and, to the exclusion of the appellee, select there all the odd-numbered sections to which that company would otherwise be entitled.

We do not think this proposition is sound. It has been the practice and usage of the land department, when these conflicting lines relate to the limits within which the designated alternate odd-numbered sections are to be found, to hold that the respective companies take the lands so situated in undivided moieties, without regard to the date of location of the lines of road. The parties to this litigation adjusted the conflict where their roads crossed on that basis, and the principle is a necessary result of the rule that no priority of right is secured by priority of location. We entertain no doubt of its soundness.

It follows from these principles that the decision of the Supreme Court was right that the lands embraced in its first class, namely, those found within the six-miles limit of the road of the plaintiff below, the Winona Company, and without the six-miles limit of the defendant, were definitely fixed and ascertained to belong to the former when its line was located, and could not be taken to supply deficiencies in the grant of the other company, whether its road was located first or last.

A careful examination of the list of lands decreed by the court to be the property of plaintiff below, demonstrates that much the larger proportion of the lands in controversy, probably nine-tenths of them, belong to this class, and are found

within the limits of the Winona Company's six-miles primary grant.

It is also to be remarked that this includes all the lands in controversy lying east of the west line of range thirty-nine (39).

With regard to the lands of the second class, as classified by the Supreme Court, the decision depends upon the right of selection by the respective parties, or of the State for them, for lands not found within the six-miles limit and the twenty-miles limit when their respective roads were located.

By the act of 1857 these selections could only be made within fifteen miles of the line of the road, and the court says that the lands, which it now classifies together in this second group, are within the fifteen-miles or indemnity limit of the Winona road, and are *not* within the fifteen-miles or indemnity limit of the St. Paul road, but they *are* within the twenty-miles limit of the latter road.

In regard to these lands, the court held that the right of the Winona Company was superior, under the act of 1857, to the St. Paul Company's claim, under the act of 1864, and that the latter had no other claim.

This act of 1864, 13 Stat. 72, was one which, by its title, was passed to give to the State of Iowa lands in aid of a road from McGregor, on the Mississippi River, to the western boundary of the State, and another road from Sioux City to the Minnesota line in the county of O'Brien. To this State was given the alternate sections, designated by odd numbers, for *ten* sections on each side of these roads. As the Sioux City road was probably intended to meet the road from St. Paul and St. Anthony towards the mouth of the Big Sioux River, at the line between the two States, Congress by the seventh section enlarged the grant to this latter road to make it equal to that of the Iowa roads. This section reads as follows:

"SEC. 7. That there be, and is hereby, granted to the State of Minnesota, for the purpose of aiding in the construction of a railroad from St. Paul and St. Anthony, via Minneapolis, to a convenient point of junction west of the Mississippi, to the southern boundary of the State, in the direction of the mouth of the Big Sioux river, four additional alternate sections of

land per mile, to be selected upon the same conditions, restrictions and limitations as are contained in the act of congress entitled 'An act making a grant of land to the territory of Minnesota, in alternate sections, to aid in the construction of certain railroads in said territory, and granting public lands, in alternate sections, to the state of Alabama to aid in the construction of a certain railroad in said state,' approved March third, eighteen hundred and fifty-seven: *Provided,* That the land to be so located by virtue of this section may be selected within twenty miles of the line of said road, but in no case at a greater distance therefrom." 13 Stat. 74.

By the act of March 3, 1865, 13 Stat. 526, it was enacted that the grant of lands to the State of Minnesota to aid in the construction of railroads, of March 3, 1857, "shall be increased to ten sections per mile for each of said roads and branches, subject to any and all limitations contained in said act and subsequent acts, and as hereinafter provided," thus placing all the other Minnesota roads on an equality in that respect with the one from St. Paul and St. Anthony to the Iowa State line. This statute also requires that the first proviso to the first section of the act of 1857 be so amended as to read, that the land so located shall in no case be farther than twenty miles from the lines of said roads, and said lands shall in all cases be indicated by the Secretary of the Interior. It also provides that nothing herein contained shall interfere with any existing rights acquired under any law of Congress heretofore enacted granting lands to the State of Minnesota to aid in the construction of railroads.

There is nothing in either of these statutes which indicates or requires that the six-miles limit of the original grant is to be enlarged, so that within a limit of ten miles all the odd sections fall immediately within the grant on the location of the road. Such language was used in the fourth section of the act concerning the Union Pacific Railroad in 1864, only a few weeks later than the act of that year, now under consideration. There it was enacted that the words of the act of 1862 should be so changed as to change the original limits, and include within that grant the sections added to it by the amendment

of 1864. *United States* v. *Burlington & Missouri River Railroad Co.*, 98 U. S. 334.

In addition to this significant fact, both the acts of 1864 and of 1865 speak of the additional sections to be *selected*, a word wholly inapplicable to lands in place, which are not ascertained by selection, but are fixed and determined by the location of the line of the road. The act of 1865, which is to be considered *in pari materia* on this point, provides that these lands shall be *indicated* by the Secretary of the Interior.

What this word indicated means may admit of some doubt, but taken in connection with the other two statutes, and other acts granting lands to aid in the construction of railroads, it probably means no more than what is expressed in the act of 1857, namely, that the selections of lieu lands shall be made by the governor or his agent, and *approved* by the Secretary.

We think, therefore, that these additional lands granted to appellant, under which it claims the right to go into the limits of appellee's primary grant, are lands to be *selected*, and that some selection on the part of appellee, or for its benefit, must be shown. As to the lands in the second class of the Minnesota Supreme Court, it is found as a fact, by the amended finding, in which the attention of the court was specially turned to that matter, that no selection of any of them was ever made by defendant below, or by any one for that company. The language of the court in its supplementary finding of facts is:

" Neither the State nor the defendant, nor any agent of the State or of the defendant, ever selected for the defendant, or on account of the location or construction of its line of road, any of the lands in controversy in this action lying west of the west line of range (37) thirty-seven."

As all the lands in controversy lying east of this line are included in the first class as being within the plaintiff's six-miles limit of land in place, and as no *selection* on behalf of defendant has ever been made of any of the lands west of that line, these two facts would seem to dispose of the whole controversy. For while the inferior court so far modified its first finding, namely, that both parties did on the 23d day of May, 1872, present lists of all the lands in controversy to the local district

land officers as selections under their respective grants, as to say that no selections were ever presented by *defendant* for any lands west of range thirty-seven, it left the fact that lists of selection for these latter were presented by *plaintiff* to stand, and also of the payment of the office fees, and that the lists were certified to the department. There was then a selection of the lands included in this class made by plaintiff or for its benefit on the 23d of May, 1872, and no selection of them ever made by or on behalf of defendant.

The time when the right to lands becomes vested, which are to be selected within given limits under these land grants, whether the selection is in lieu of lands deficient within the primary limits of the grant, or of lands which for other reasons are to be selected within certain secondary limits, is different in regard to those that are ascertained within the primary limits by the location of the line of the road. In *Ryan* v. *Railroad Co.*, 99 U. S. 382, this court, speaking of a contest for lands of this class, said: "It was within the secondary or indemnity territory where that deficiency was to be supplied. The railroad company had not and could not have any claim to it until specially selected, as it was for that purpose;" and the reason given for this is that "when the road was located an l maps were made the right of the company to the odd sections first named became fixed and absolute. With respect to the lieu lands, as they are called, the right was only a float, and attached to no specified tracts until the selection was actually made in the manner prescribed."

The same idea is suggested, though not positively affirmed, in the case of *Grinnell* v. *Railroad Co.*, 103 U. S. 739.

In the case of the *Cedar Rapids Railroad Co.* v. *Herring*, 110 U. S. 27, this principle became the foundation, after much consideration, of the judgment of the court rendered at the last term. And the same principle is announced at this term in the case of the *Kansas Pacific Railroad Co.* v. *Atchison, Topeka & Santa Fé Co.*, *ante*, 414.

The reason of this is that, as no vested right can attach to the lands in place—the odd-numbered sections within six miles of each side of the road—until these sections are ascertained

and identified by a legal location of the line of the road, so in regard to the lands to be selected within a still larger limit, their identification cannot be known until the selection is made. It may be a long time after the line of the road is located before it is ascertained how many sections, or parts of sections, within the primary limits have been lost by sale or pre-emption. It may be still longer before a selection is made to supply this loss.

The plaintiff in error insists that the map of its line of road was filed in 1859. The court of original jurisdiction finds that, up to the time of the trial in October, 1878, a period of nearly twenty years, no selection of these lands had ever been made by that company, or any one for it. Was there a vested right in this company, during all this time, to have not only these lands, but all the other odd sections within the twenty-mile limits on each side of the line of the road, await its pleasure? Had the settlers in that populous region no right to buy of the government because the company might choose to take them, or might, after all this delay, find out that they were necessary to make up deficiencies in other quarters? How long were such lands to be withheld from market, and withdrawn from taxation, and forbidden to cultivation?

It is true that in some cases the statute requires the land department to withdraw the lands within these secondary limits from market, and in others the officers do so voluntarily. This, however, is to give the company a reasonable time to ascertain their deficiencies and make their selections.

It by no means implies a vested right in said company, inconsistent with the right of the government to sell, or of any other company to select, which has the same right of selection within those limits. Each company having this right of selection in such case, and having no other right, is bound to exercise that right with reasonable diligence; and when it is exercised in accordance with the statute, it becomes entitled to the lands so selected. The unascertained float then becomes a vested right to an identified tract of land.

In this case, and for these reasons, priority of selection secures priority of right.

The judgment of the Supreme Court as to the land in this, its second class, is correct, whatever may have been its reasons for it.

It is no answer to this to say that the Secretary of the Interior certified these lands to the State for the use of the appellant. It is manifest that he did so under a mistake of the law, namely, that appellant, having made the earlier location of its road through these lands, became entitled to satisfy all its demands, either for *lieu* lands or for the extended grant of 1864, out of any odd sections within twenty miles of that location, without regard to its proximity to the line of the other road. We have already shown that such is not the law, and this erroneous decision of his cannot deprive the Winona Company of rights which became vested by its selection of those lands. *Johnson* v. *Towsley,* 13 Wall. 72, 80; *Gibson* v. *Chouteau,* 13 Wall. 92, 102; *Shepley* v. *Cowen,* 91 U. S. 330, 340; *Moore* v. *Robbins,* 96 U. S. 530, 536.

We see no error in the judgment of the Supreme Court of Minnesota, and it is accordingly

*Affirmed.*