ST. PAUL, M. & M. R. Co. *v.* GREENHALGH and others.

SAME *v.* WENZEL.

*(Circuit Court, D. Minnesota.   March 3, 1886.)*

1. LAND LAWS—ACTS OF CONGRESS OF JUNE 22, 1874, AND APRIL 21, 1876—ACTS MINNESOTA LEGISLATURE, MARCH 1, 1877, AND MARCH 8, 1878—CONSTRUCTION.

   The acts of congress of June 22, 1874, April 21, 1876, and the acts of the legislature of Minnesota of March 1, 1877, and March 8, 1878, all were passed after the time given for the completion of the railroad, when there had been a non-performance of the conditions of the grant, and when, therefore, there existed the right of absolute and total forfeiture by the grantor,—the United States,—and of resumption and transfer by the state to another beneficiary.

2. SAME—RAILROAD COMPANY—BONA FIDE SETTLERS—PRIORITY.

   Congress and the legislature of Minnesota both intended to give to actual *bona fide* settlers priority over the railroad company.

3. SAME—LAND GRANTS—HOW TO BE CONSIDERED.

   All legislative grants are to be regarded as not merely contracts, but also as laws. As such they are subject to the same rules of interpretation that govern other laws, and a primary rule is that the intent of the legislator is to be sought, and, when found, controls. The technical rules that govern the interpretation of private contracts must always yield to the single inquiry of the intent of one party,—the legislature.

4. SAME—AS TO TITLE, INTENT OF GRANTOR IS TO BE CONSIDERED IN EQUITY.

   There is no equity in striking down a legal title when so to do involves a disregard of the manifest intent of the original owner, grantor of such legal title.

In Equity.

*Geo. B. Young, R. B. Galusha,* and *S. U. Pinney,* for complainant.

*J. B. Beals,* for defendants.

BREWER, J. These causes are so nearly alike that they may be considered together. The complainant claims to be the equitable owner of certain lands, the legal title to which is in defendants, and filed these bills to enforce such claim. Both tracks lie along the line of the St. Vincent extension of complainant's railway, and north of the indemnity limits of the Northern Pacific road. The definite location of this line was made in 1871, and a map thereof filed with

the secretary of the interior, and approved December 20, 1871. The Greenhalgh land is within ten miles of this line, and the Wenzel tract within six miles. The road was built past the Greenhalgh land in November, 1872, and finished to St. Vincent by November, 1878. After the filing of the map of the definite location, and on February 15, 1872, the secretary of the interior withdrew from sale or other ·disposal the odd-numbered sections within 20 miles. On June 18, 1872, the secretary directed the vacation of this order of withdrawal, notice of which was received at the local land-office on July 5, 1872. This order of vacation was itself revoked on September 4, 1872. On June 26, 1872, Greenhalgh settled on the land in controversy in his case, subsequently filed and proved up his claim, and received a patent. Wenzel settled on his tract June 2, 1874, and filed his claim September 2, 1874. The various acts of congress upon which complainant's title rests were nearly all quoted in the opinion just filed in the case of *Northern Pacific R. Co.* v. *St. Paul, M. & M. Ry. Co., ante,* 551, and I shall simply refer to them here. In the outset defendants challenge the validity of complainant's grant in this upper part of the St. Vincent extension, and upon three grounds: *First,* that this was Indian lands in 1857, and therefore never subject to the grant; *second,* the change authorized by the act of 1871 was not in accord with the legislation of Minnesota; *third,* the line of definite location was · not within the scope of that act. Neither is sufficient.

*First.* The Indian title was extinguished by treaty, May 5, 1864. The sixth section of the act of 1857 reads:

"Sec. 6. And be it further enacted, that in case any of the lands on the line of said roads or branches are within any Indian territory, no title to the same shall accrue, nor shall the same be entered upon by the authority of said territory or state *until the Indian title to the same shall have been extinguished.*"

Now, in the *Lawrence, L. & G. R. R. Case,* 92 U. S. 743, the question was whether words of general grant would operate on lands in an Indian reservation created by treaty stipulation, and the court say: "The grant is silent as to such a purpose, but if it was to take effect in the Osage country, on the surrender of the Indian title, it would have so declared." This act contained the provision suggested. Under this rule, section 6 opened these lands to this grant when the Indian title ceased, which was before the definite location. The act of 1865, which restored the grant, was passed after the Indian title had been extinguished, and operated as a new grant, unobstructed by any prior Indian title.

*Second.* The case of *Nash* v. *Sullivan,* 29 Minn. 206, S. C. 12 N. W. Rep. 698, is conclusive as to the harmony between the act of congress and the state legislation. It matters not that that decision was made to uphold a patent title. The *ratio decidendi* affirms the accord, and governs all cases. The action of the state, as well as of the general government, is an equal affirmation.

*Third.* Any question that might otherwise exist as to the line of definite location being within the scope of the congressional grant is put at rest by the act of congress of March 3, 1873, which declares "that the time for the completion ❋ ❋ ❋ of the road from St. Cloud to St. Vincent, in said state, *as now located, with the approval of the secretary of the interior,* be extended for the period of nine months." I have no doubt of the validity of the complainant's title in this portion of its grant.

Thus far the way is clear; but, after all, the question in these cases arises under the acts of congress of June 22, 1874, and April 21, 1876, and of the state of March 1, 1877, and March 9, 1878. It is claimed generally that prior to any final vesting of title in the complainant to these lands, and while the full control and disposal of them remained with congress, that body exempted them from the operation of complainant's grant, and that the state took similar action. Before examining the acts referred to, let us see when, under what circumstances, and to what extent, but for them, and for the settlement of defendants, the title to these lands would have passed to complainant. The complainant took nothing by the withdrawal. A withdrawal passes no title. It only prevents other titles from accruing. A definite location of the road identifies the tracts within the place-limits, and a title thereto passes, by relation, as of the date of the grant, subject to the defeasance upon failure to perform the conditions of the grant within the time limited. The title to indemnity lands passes only upon selection. Wenzel's land was within the place-limits; Greenhalgh's not. For since the decision in *St. Paul R. Co.* v. *Winona R. Co.,* 112 U. S. 720, S. C. 5 Sup. Ct. Rep. 334, and *Winona R. Co.* v. *Barney,* 113 U. S. 618, S. C. 5 Sup. Ct. Rep. 606, it must be considered as settled that the grant of lands in place was limited to six sections, and that the additional four sections were simply a grant by quantity. The selection of the Greenhalgh land was made by the company on March 13, 1880, long after the several acts referred to, and long after Greenhalgh's entry. Until that time the company had no pretense of title, and all that it can claim is that, under the existing laws and withdrawal, no one else could acquire any interest therein prior thereto. As to Wenzel's tract, the definite location operated to transfer, as of the date of the grant, the title to the company, subject to forfeiture on failure to build the road within the time limited. After such failure the grantor had power to forfeit the grant and retake the land. Having power to forfeit the entire grant absolutely, it had the lesser and included power of forfeiting a part and conditionally. The act of June 22, 1874, by its first section, extends the time for the completion of this road to March 3, 1876, and "no longer, upon the following conditions: That all rights of actual settlers, and their grantees, who have heretofore in good faith entered upon and actually resided on any of said lands prior to the passage of this act, or who otherwise

have legal rights in any of such lands, shall be saved and secured to such settlers or other persons in all respects the same as if said lands had never been granted to aid in the construction of said lines of railroad." The second section requires acceptance by the company as a condition of receiving the benefits of the act. No acceptance was ever made. The first and third sections of the act of April 21, 1871, read as follows:

"Section 1. All pre-emption entries, or entries in compliance with any law of the United States, of the public lands, made in good faith, by actual settlers, upon tracts of land of not more than one hundred and sixty acres each, within the limits of any land grant, prior to the time when notice of the withdrawal of the lands embraced in such grant was received at the local land-office of the district in which said lands are situated, or after their restoration to market by order of the general land-office, and where the pre-emption laws have been complied with, and proper proofs thereof have been made by the parties holding such tracts or parcels, they shall be confirmed, and patents for the same shall issue to the parties thereto."

"Sec. 3. All such pre-emption entries which may have been made by permission of the land department, or in pursuance of the rules and instructions thereof, within the limits of any land grant at a time subsequent to expiration of such grant, shall be deemed valid, and a compliance with the laws, and the making of the proof required shall entitle the holder of such a claim to a patent therefor." U. S. St. §§ 206–208.

Section 10 of the state act of March 1, 1877, provides that the complainant "shall not in any manner, directly or indirectly, acquire or become seized of any right, title, interest, claim, or demand in or to any piece or parcel of land * * * upon which any person or persons have in good faith settled, and made or acquired valuable improvements thereon on or before the passage of this act;" "that the governor shall deed and relinquish such lands to such settlers;" and also that "upon the acceptance of the provisions of this act by said company, it shall be deemed by the governor of this state as a relinquishment by said company of all such lands so occupied by such actual settlers." No acceptance, as above provided for, was ever made by the company. Section 3 of the act of March 9, 1878, which is an act amendatory of the act of 1877, contains a proviso that "nothing shall be construed under this act which will waive the right of the state to receive the full grant of ten sections per mile of completed road from the United States;" and also that, upon the completion of a certain named portion of the line, "the governor of the state may convey or certify to said company all the rest, residue, and remainder of the lands granted by the United States to the state of Minnesota to aid in the construction of said line of railroad."

I believe this brings all the material facts before us for consideration. With reference to the act of June, 1874, it may be regarded, on the one hand, as merely a proposition calling for acceptance, and no acceptance being given, wholly without force; on the other hand, as a declaration of the owner of the land of the conditions upon which alone the proffered grant, then subject to forfeiture, would be

continued in force,—in fact a legislative declaration of forfeiture of an existing but unearned grant, coupled with a tender of a new grant upon certain conditions, the acceptance provided for being only the ordinary anticipatory declaration of an intent to comply with the conditions upon which the grant was made, the formality of which is waived by an actual compliance with the conditions. So the act of March, 1877, may be subject to the like criticism of being simply an offer without acceptance, and to the further criticism of an implied repeal by the act of March, 1878, which affirms the right of the state to the entire grant from the United States, and authorizes its conveyance to the company upon the completion of a specified portion of the road.

On the other hand, it may be said that the act of 1877, in direct and explicit terms, as was within the power of the legislature to do, takes from the company every tract occupied by *bona fide* settlers; that the purpose of the acceptance was only information to the governor, and to guide his official action, and in no manner limited the legislative transfer to *bona fide* settlers of all rights and interests in those tracts under the grant from the United States; that the act of 1878, being in terms only an amendment of that of 1877, and containing no express repeal of said section 10, is to be construed in harmony therewith, and means simply to authorize a transfer to the company of all lands within the grant not otherwise disposed of by the provisions of the act.

With reference to the act of April, 1876, it may be urged that the term "entry" means the filing of the claim with the land-office, and not the mere settlement on the land; that Greenhalgh's entry was not made during the revocation of the withdrawal; that his settlement, though after the order of revocation, was prior to the receipt of that order at the land-office, and therefore prior to the actual restoration to market; that while Wenzel's settlement was made after the expiration of the time limited for the building of the road, yet his entry was not until after the act of June 22, 1874, extending the time, and thus while the grant was in full force. Further, that the words "such pre-emption entries" in section 3 refer to entries of the kind named in sections 1 and 2, and mean only entries prior to the receipt at the local land-offices of the notices of withdrawal, or after the restoration to market, and therefore do not cover a settlement or entry like his; and finally that, under the decision in *Schulenberg* v. *Harriman*, 21 Wall. 62,—a decision prior by some three years to the act of 1876,—a grant does not expire by the mere non-performance of a condition subsequent, but only upon some legal forfeiture, and hence that said third section has no application to the present case. On the other hand, it may be said that the term "entry," in its general use, signifies a settlement with a view to purchase or homesteading; that, at any rate, it relates back to the time of such settlement, and has force from that date, and obviously is used here to cover and pro-

tect rights originating from the settlement; that both withdrawals and vacations thereof date and have operative force from the time they are ordered at Washington, and not from the time notices thereof are received at the local land-offices; that if Wenzel's entry was not technically until after the act of June 22, 1874, extending the grant, it was protected by the very terms of that extension; that the words "such pre-emption entries," though referring back, only mean pre-emption entries in good faith by actual settlers, and do not include all the circumstances attending such entries as are named in the prior sections; and that the expression "expiration of grant" must refer to the time limited in the original granting act for the performance of the condition, for if it referred to the actual forfeiture it would be meaningless, as then the land would be covered by the general acts for disposal of public lands.

I have thus endeavored to outline the principal suggestions on both sides in reference to the force and effect of these several statutes. I propose no further comment on them separately, but state some propositions based upon them collectively.

*First.* All were passed after the time given for the completion of the road, when there had been a non-performance of the conditions of the grant, and when, therefore, there existed the right of absolute and total forfeiture by the grantor, the United States, and of resumption and transfer by the state to another beneficiary.

*Second.* Nothing can be plainer than that both congress and the state legislature intended to give to actual *bona fide* settlers priority to the railroad company. Such intent breathes in every statute and permeates every section.

*Third.* All legislative land grants are to be regarded, not merely as contracts, but also as laws. As such, they are subject to the same rules of interpretation that govern other laws, and a primary rule is that the intent of the legislator is to be sought, and, when ascertained, controls. The technical rules which govern the interpretation of private contracts must always yield to the single inquiry of the intent of the one party,—the legislature.

*Fourth.* The legal title is in the defendants. Complainant rests upon its alleged equitable rights. There is no equity in striking down a legal title when so to do involves a disregard of the manifest intent of the original owner, grantor of such legal title.

Decrees will be entered in favor of the defendants, dismissing the bills, at cost of complainant.