[No 2912. Decided October 4, 1898.]

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant,* v. ALCANA MILLER *et al., Respondents.*

RAILROADS — LAND GRANTS — FORFEITURES — EJECTMENT — PATENTS — COLLATERAL ATTACK.

Ejectment is the proper remedy where a railroad company claiming land under a prior grant of the government seeks to obtain possession as against parties holding the land under a subsequent patent from the United States; and in such action the validity of a patent is subject to collateral attack.

Under the act of congress of September 29, 1890, providing for the forfeiture to the United States of all lands granted to railroads opposite to, and co-terminous with, the portion of the road not completed and in operation, for the construction or benefit of which such lands were granted, and declaring that all such lands are a part of the public domain, an equal undivided moiety of the land within the conflicting overlap of

the grants to the Northern Pacific Railroad Company for the main line down the Columbia river and the branch line across the Cascades reverted to the United States, by reason of the failure to construct the main line.

Appeal from Superior Court, Klickitat County.—Hon. A. L. MILLER, Judge. Affirmed.

*Stoll, Stephens, Bunn & Macdonald,* for appellant.

*N. B. Brooks,* for respondents.

The opinion of the court was delivered by

REAVIS, J.—Action in ejectment commenced in the superior court of Klickitat county by Northern Pacific Railroad Company and Burleigh, its receiver, against defendants (respondents) to recover possession of section 15 in township 6 N., of range 20 E. of the W. M. in Klickitat county. The complaint avers ownership and possession of the premises in the plaintiff (appellant) about December, 1892, and that at that date the respondents wrongfully and unlawfully entered into possession of the premises and ousted and ejected the railroad company therefrom and continue withholding possession from the plaintiff. Defendants deny plaintiff's title and allege ownership in themselves. Before the trial in the superior court by stipulation of all the parties to the record and order of the court entered thereon the Northern Pacific Railway Company was substituted in place of the original plaintiff, the Northern Pacific Railroad Company. The facts were all stipulated between the plaintiff and defendants and findings made by the court in accordance therewith and the cause tried without the intervention of a jury. Substantially the facts are, that by the act of congress of July 2, 1864 (13 U. S. Stat. 365), the Northern Pacific Railroad Company was created a body corporate and authorized to construct

" A continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin; thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude to some point on Puget Sound, with a branch via the valley of the Columbia river to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus."

And by § 3 of the same act it is declared:

" That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

And the sixth section of the act provided as follows:

" That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or preemption before or after they are surveyed, except by said company as provided in this act."

On May 31, 1870 (16 U .S. Stat. 378), by joint resolution of congress it was provided that the said company was authorized, among other things, to

" Locate and construct under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget Sound, via the valley of the Columbia river, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within ten miles on each side of the said road beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four."

On the 26th of July, 1870, the railroad company transmitted to the secretary of the interior a map showing the line of general route of the main line of the Northern

Pacific railroad extending from a point on the Columbia river opposite the mouth of the Walla Walla river in Washington Territory, thence westerly along the northern bank of the river, via Vancouver, to Kalama, thence north-erly to Puget Sound in Washington Territory. The map was received by the secretary July 30, 1870, and on August 13, 1870, the secretary transmitted the map to the commissioner of the general land office with instructions to direct the proper local officers to withhold from sale, pre-emption, homestead or other disposal the odd numbered sections not theretofore reserved or sold, and to which prior rights had not attached for twenty miles in width on each side of said line of general route, and on the same day the map of general route was filed in the general land office. On the 20th day of September, 1870, the commissioner of the general land office transmitted to the register and receiver of the district land office for the district of Vancouver, Washington Territory, a diagram showing the portion of the line of general route of the railroad designated upon the map filed August 13, 1870, and extending through the said land district, with instructions to the register and receiver to withhold from sale or location, homestead or pre-emption entry, all the odd numbered sections of public lands falling within the limits of twenty miles on each side of said line, as designated on the map. Thereafter, on October 27, 1870, the secretary of the interior further instructed the commissioner to increase the withdrawal of lands on each side of said road to forty miles on each side thereof, and the commissioner transmitted directions to the district land office at Vancouver to withhold from sale, location, homestead or pre-emption entry the odd numbered sections of land in the additional limits of twenty miles as designated on the diagram. Section 15, the land in controversy in this action, was within the limits of the withdrawal above described.

On June 29, 1883, the railroad company filed a map of definite location of its branch line to Puget Sound extending from a point of junction on its main line near Ainsworth in Washington Territory to Yakima, and the said section 15 in controversy here was within forty miles of that portion of the line of the railroad so definitely fixed. On June 29, 1883, the date at which the definite location of the branch line was made, the section of land in controversy was not sold, granted or otherwise appropriated and was free from pre-emption claims or rights except for the reservations in favor of the main line of the railroad company, and such claims or rights as the company had acquired by virtue of fixing its said line of general route as hereinbefore stated. Thereafter the railroad company constructed a portion of its branch railroad twenty-five miles in length opposite to and co-terminous with said section 15, and that portion of the road was examined and approved by commissioners appointed by the president of the United States and accepted by him, and it was ordered that patents for the land earned by its construction be issued to the company. By an act approved September 29, 1890 (26 U. S. Stat. 496), entitled "An Act to forfeit certain lands heretofore granted for the purpose of aiding in the construction of railroads, and for other purposes," it was enacted

" That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted railroads opposite to and co-terminous with the portion of any such railroad not now completed, and in operation, for the construction or benefit of which such lands were granted; and all such lands are declared to be a part of the public domain.   .   .   .

" Sec. 5.    That if it shall be found that any land heretofore granted to the Northern Pacific Railroad Company and so resumed by the United States and restored to the public domain lie north of the line known as the 'Harrison

line,' being a line drawn from Wallula, Washington, easterly to the southeast corner of the northeast one-fourth of the southeast quarter of section 27, in township 7 north, of range 37 east, of the Willamette meridian, all persons who had acquired in good faith the title of the Northern Pacific Railroad Company to any portion of said lands prior to July 1, 1885, or who were at said date in possession of any portion of said lands, or had improved the same, claiming the same under written contract with said company, executed in good faith, or their heirs or assigns, as the case may be, shall be entitled to purchase the lands so acquired, possessed or improved, from the United States, at any time prior to the expiration of one year after it shall be finally determined that such lands are restored to the public domain by the provisions of this act, at the rate of $2.50 per acre, and to receive patents therefor upon proof before the proper land office of the fact of such acquisition, possession or improvement, and payment therefor, without limitation as to quantity.   .   .   .

" Sec. 6. That no lands declared forfeited to the United States by this act shall by reason of such forfeiture inure to the benefit of any state or corporation to which lands may have been granted by congress, except as herein otherwise provided. Nor shall this act be construed to enlarge the area of land originally covered by any such grant, nor to confer any right upon any state, corporation or person, to lands which were excepted from such grant. Nor shall the moiety of the lands granted to any railroad company on account of a main and a branch line appertaining to uncompleted road, and hereby forfeited, within the conflicting limits of the grant for such main and branch lines, when but one of such lines has been completed, inure by virtue of the forfeiture hereby declared, to the benefit of the completed line."

On the 24th of December, 1890, the secretary of the interior, construing the act of forfeiture, instructed the commissioner of the general land office as follows:

"   .   .   .   By the first section of the act the grant to the Northern Pacific Railroad Company, appertaining

to the main line between Wallula, Washington, and Portland, Oregon, is forfeited.

" This renders it necessary to establish terminals separating the granted lands from those forfeited at these points. . . .

" Section 6 of the act provides:

. " 'Nor shall the moiety of the lands granted to any railroad company on account of a main and a branch line appertaining to uncompleted road, and hereby forfeited, within the conflicting limits of the grants for such main and branch lines, when but one of such lines has been completed, inure by virtue of the forfeiture hereby declared to the benefit of the completed line.'

"You state that the grant appertaining to the main line of the Northern Pacific railroad, forfeited by this act, is overlapped by the limits adjusted upon the constructed branch line of said road, and as to such overlap the grant is of a moiety on account of each line; that the map of general route of the main line opposite said conflict was filed and a legislative withdrawal made thereon prior to the location of the branch line and that the withdrawal continued in force at the date of the passage of the forfeiture act. You conclude that within the conflict every alternate odd numbered section should be reserved for the branch line, and the remaining odd sections restored to the public domain under said section 6, and suggest that the company be called upon to elect which of such alternate odd numbered sections it will take in satisfaction of the moiety for its branch lines. All of this meets my approval.

" The company urges that as the main line had not been definitely located, between Wallula and Portland, the lands within the withdrawal on general route for that distance can not be treated as granted lands, and are therefore not subject to said provisions as to moiety lands within the overlapping limits.

" This contention can not be maintained. In the first place there was a grant along said route which lacked only action on the part of the company to consummate. Furthermore, the reading of the entire act leaves no room to doubt that a forfeiture along said stretch of the main line

was contemplated, and the lands so forfeited are described in the first section of the act as 'granted' lands.    If this be not true, there has been no forfeiture at all on that part of the line, a conclusion which even the company does not maintain.    It is equally apparent that the word 'granted' in said section 6 is used in the same sense as in section 1, and, therefore, refers to the lands upon which the forfeiture operates.    These are the lands withdrawn along said line.

" You will accordingly notify the company to indicate within thirty days from notice what alternate odd numbered sections it will elect to take.    If the company elects to take sections 1, 5, 8, 13, etc., of the various townships, then sections 3, 7, 11, 15, etc., will remain to the government and be restored to the public domain, or *vice versa*. Should the company fail to make its election within said time, then your office will act in that capacity in its stead."

Thereafter on the 30th day of December, 1890, the commissioner notified the railroad company of the construction the secretary had given the act of forfeiture, and the company was directed to elect which of the alternate odd numbered sections it would take.    In accordance with this order the railroad company stated that whereas it had theretofore sold to parties purchasing in good faith large tracts of land both in the odd numbered sections and in the alternate odd numbered sections situated within the overlapping limits of the reservation of lands on the line of the general route of that portion of said main line extending from Wallula, Washington, to Portland, Oregon, which part of its main line had never been constructed and on which the line of said railroad had never been definitely fixed, and many of the tracts were of greater area than 320 acres and the purchasers had settled upon and improved the lands and were occupying the same as homes and had spent large sums of money in improving the same, therefore, to facilitate the adjustment of the grant and

to protect fully said purchasers and settlers in their homes and improvements, but not thereby waiving or abandoning any right or claim the company had to all the odd numbered sections under the act of congress, such selections were made in accordance with the order, and the company elected the moiety to which it was entitled under the order of the commissioner, after filing its protest as mentioned. The defendants in 1892 entered upon said section 15, and at the time each of said defendants was duly qualified to make entry of public lands under the laws of the United States and such entry was made in pursuance of notice from the land department of the United States authorizing the same, and on the 8th day of August, 1893, patents were duly issued and delivered to each of said defendants for the land so entered by him, and each of said defendants is now in possession of the land so patented to him. The judgment was in favor of defendants.

1. The section of land in controversy involves the question of title to several thousand acres of land in Yakima and Klickitat counties upon which qualified persons have been authorized by the land department of the United States to settle and improve homes. Counsel for the respondents here for the first time has raised the question that the patents from the United States issued to each of the respondents are conclusive against the appellant in an action at law and can not be collaterally attacked. The contention of appellant upon the procedure is that the patents issued to respondents are void for the reason as alleged that the lands in controversy were granted by congress to the Northern Pacific Railroad Company prior to their issuance to respondents by the land department, and this form of action seems to be authorized by the highest authority. *Northern Pacific R. Co. v. Colburn,* 164 U. S.

383 (17 Sup. Ct. 98) ; *Burfenning v. Chicago, St. P., etc., Ry. Co.,* 163 U. S. 321 (16 Sup. Ct. 1018) ; *Doolan v. Carr,* 125 U. S. 624 (8 Sup. Ct. 1228), and cases cited; *Riley v. Welles,* 154 U. S. 578 (14 Sup. Ct. 1166).    The procedure in this state (§ 5500, Bal. Code) authorizes an action for possession of real estate and to quiet title and remove a cloud.    *Reichenbach v. Washington Short Line Ry. Co.,* 10 Wash. 357 (38 Pac. 1126).    Section 5508, Ballinger's Code, provides that plaintiff shall set forth in his complaint the nature of his claim or title to the property and that defendant may set up a legal or equitable defense to plaintiff's claim and the superior title, whether legal or equitable, shall prevail, and § 5509 of the same code requires the defendant to set out his title. The case having been heard upon an agreed statement of facts, respondents cannot here avoid any relief which the stipulated facts show appellant is entitled to.    They are in the same position as if evidence had been admitted without objection to prove the facts, though not included in the pleadings.

2. The solution of the controversy depends upon the construction of the grant of lands by congress to the Northern Pacific Railroad Company. The case of *Oregon & C. R. Co. v. United States,* decided in the circuit court of appeals for the ninth circuit, 77 Fed. 67, is cited by counsel for appellant in support of its contention that because the Northern Pacific Railroad Company filed no definite map of location for its main line down the Columbia river, under the original grant of July 2, 1864, or the subsequent grant under the joint resolution of May 31, 1870, therefore the lands within the limits granted to it remained thereafter public lands of the United States and thus when the definite location of the Cascade branch of the Northern Pacific Railroad Company was made to

Yakima, June 29, 1883, the grant to the branch line attached, and the section in controversy here was in place and identified as property originally granted for the construction of the branch line; but it seems to have been decided by the circuit court of appeals in the case cited that the act of July 2, 1864,—the original grant to aid in the construction of the Northern Pacific railroad,—did not in itself operate as a withdrawal or appropriation of the public lands within the prescribed limits of the route, and by reason of the failure of the company to file a sufficient map of *general* location opposite lands subsequently traversed by the Oregon & California Railroad Company prior to the grant made to the latter company, the grant to the Northern Pacific Company never took effect as to such lands, and the title thereof passed to the Oregon & California company. But in that case the facts shown were that the grant to the Oregon & California Railroad Company was made subsequent to that to the Northern Pacific Railroad Company on the 2d of July, 1864, and before any map of the general route of the Northern Pacific line had been filed and before any general withdrawal had been directed under the terms of the granting act; but the conclusion of the majority of the court awarding the lands to the Oregon & California railroad was dissented from by Mr. Justice McKENNA, who maintained, by cogent reasoning and citation of authority, that, at the date of the grant to the Oregon & California company, the right of locating its road so as to take the lands in question existed unimpaired in the Northern Pacific Company and continued to exist until the act of forfeiture in 1890, in consequence of which the lands did not pass to the Oregon & California Company, but were restored by the act of forfeiture to the United States. It may be observed that the decision of the circuit court of appeals is

upon very different facts from the case now under consideration. The grant of lands to the Northern Pacific Railroad Company from the point now involved to Puget Sound in the original act of July 2, 1864, and also the subsequent grant of May 31, 1870, was for a *main* and a *branch line*. In the grant of May 31, 1870, as said by Mr. Secretary LAMAR in *Railroad Co. v. McRae*, 6 Land Dec. Dep. Int. 400, and approved by the court:

" The designations of the lines of the road were changed. That which by the granting act was known as the 'branch line' (via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon) was changed to 'main road' or 'main line,' and that which had been designated as 'main line' (across the Cascade Mountains to Puget Sound) was changed to 'branch line.' So, by the joint resolution of 1870 [May 31st], the company was authorized to locate and construct its main line via the valley of the Columbia river, through some point at or near Portland, Oregon, to a suitable point on Puget Sound, with the privileges, grants, and duties provided for in its act of incorporation."

The grant was *in praesenti*. The language is "that there be, and hereby is, granted." The construction and effect of such words of grant have often been considered by the supreme court of the United States.

" In the recent case of *St. Paul & P. R. Co. v. Northern Pac. R. Co.*, 139 U. S. 1, 5 (11 Sup. Ct. Rep. 389), Mr. Justice FIELD, speaking for the court, said: 'As seen by the terms of the third section of the act, the grant is one *in praesenti;* that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, pre-emption, or other disposition previous to the time the definite route of the road is fixed. The language of the statute is, "that there be, and hereby is, granted" to the company every alternate section of the lands desig-

nated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of· a float, and the title did not attach to any specific sections until they were capable of identification; but when once identified the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in praesenti;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route. This is the construction given to similar grants by this court, where the question has been often considered; indeed, it is so well settled as to be no longer open to discussion. *Schulenberg v. Harriman,* 21 Wall. 44, 60; *Leavenworth, L. & G. R. Co. v. U. S.,* 92 U. S. 733; *Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co.,* 97 U. S. 491; *Railroad Co. v. Baldwin,* 103 U. S. 426.' "

*United States v. Southern Pacific R. Co.,* 146 U. S. 570 (13 Sup. Ct. 152).

Under the joint resolution of May 31, 1870, the Northern Pacific Railroad Company located the general route of its main line by way of the Columbia river to Puget Sound. It was said in *United States v. Southern Pacific R. Co., supra:*

" The distinction between the line of definite location and the general route is well known. It was clearly pointed out in the case of *Buttz v. Railroad Co.,* 119 U. S. 55 (7 Sup. Ct. Rep. 100). The act under consideration in that case was that of July 2, 1864 (13 St. p. 365), making a grant to the Northern Pacific Railroad Company. The third section of that act, as the third of this, made the grant, and provided for the line of definite location. Section 6 authorized the fixing of the general route, and its language in respect to that matter is the same as that of section 6 of the act before us. It reads: 'That the

president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry', etc. Referring to this matter, it was said in the opinion in that case, on pages 71 and 72, 119 U. S., and page 107, 7 Sup. Ct. Rep.: 'The act of congress not only contemplates the filing by the company, in the office of the commissioner of the general land office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not at that time been reserved, sold, granted, or otherwise appropriated, and are free from preemption, grant, or other claims or rights, but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or preemption of the adjoining odd sections within forty miles on each side, until the definite location is made.    .    .    . When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land office or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain. It is to preserve the land for the company to which, in aid of the construction of the road, it is granted.    .    .    .' "

The important question is here suggested, for what purpose was the withdrawal made of the sections on each side of the main line as shown upon the map of general route? And the obvious answer seems to be, for the construction of the *main* line of the railroad from the point of junction with the Cascade branch near Ainsworth via the Columbia river to Puget Sound. Then these lands were by law reserved for that purpose and such reservation continued thereafter until the act of forfeiture of 1890. In the case of *United States v. Southern Pacific R. Co., supra,* the

title to lands in the overlapping routes between that company and the Atlantic & Pacific Railroad Company was considered by the court. The Atlantic & Pacific road having failed to build its road according to the conditions of the grant to it, congress declared its lands to be forfeited and restored to the public domain, and it was held that the claim of the Southern Pacific could not attach, upon this forfeiture, to the land along the overlapping routes; for the forfeiture was in terms for the benefit of the government, and it was apparently not the intention of congress in its grants to the Atlantic & Pacific in 1866 and the Southern Pacific in 1871 that any lands granted to the Atlantic & Pacific should go to the Southern Pacific Company in case the former grant failed to take effect. This was the rule with the overlapping lands of grants to all railroad companies and it was held that the elder grant was controlling without referenec to priority of location. The court there observed in answer to the contention of the Southern Pacific Company that when the Atlantic & Pacific Company failed to construct its road and congress forfeited the same, the forfeited lands became public lands of the United States and thereafter the grant to the Southern Pacific attached.

"   .   .   .   there can be no question, under the authorities heretofore cited, that, if the act of forfeiture had not been passed by congress, the Atlantic & Pacific could yet construct its road, and that, constructing it, its title to these lands would become perfect. No power but that of congress could interfere with this right of the Atlantic & Pacific. No one but the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It enacted that they be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific. It was not to enlarge its grant as it stood prior to the act of forfeiture. It had

given to the Southern Pacific all that it had agreed to in its original grant; and now, finding that the Atlantic & Pacific was guilty of a breach of a condition subsequent, it elected to enforce a forfeiture for that breach, and a forfeiture for its own benefit." *United States v. Southern Pacific R. Co.*, 146 U. S. 570 (13 Sup. Ct. 160).

And the same principle is declared in *St. Paul & S. C. R. R. Co. v. Winona & St. P. R. R. Co.*, 112 U. S. 720 (5 Sup. Ct. 334). It was there determined that in grants of land to aid in building railroads, the title to the lands within the primary limits within which all the odd or even sections are granted relates, after the road is located according to law, to the date of the grant; and in cases where these limits, as between different roads, conflict or encroach on each other, priority of date of the act of congress, and not priority of location of the line of road, gives priority of title. And it was also held:

" When the acts of congress in such cases are of the same date, or grants are made for different roads by the same statute, priority of location gives no priority of right; but where the limits of the primary grants, which are settled by the location, conflict, as by crossing or lapping, the parties building the roads under those grants take the sections, within the conflicting limits of primary location, in equal undivided moities, without regard to priority of location of the line of the road, or priority of construction."

As has already been observed there was a grant of lands to two distinct lines to be constructed by the Northern Pacific Railroad Company. The construction of these lines, designated as main and branch, in their objects and purposes were as if the grants had been made to two companies rather than one, but the grant to both the main and branch line was of the same date and the claim to land within the overlapping limits of each line, when con-

structed, seems to fall directly within the rule announced in *St. Paul & S. C. R. R. Co. v. Winona & St. P. R. R. Co., supra.* That is, had both the main and branch lines been constructed in conformity to the terms of the granting acts each line would have taken the land within the conflicting limits of primary location in equal undivided moieties without regard to priority of location or priority of construction. But the main line was not constructed. Yet for twenty years the land granted for such construction was reserved by legislative withdrawal for the specific purpose of such construction, and by the forfeiture act of 1890 the lands reserved for the aid of the main line were distinctly declared to be returned to the United States. It would seem obvious, therefore, that by the act of forfeiture the United States became the owner of the equal undivided moiety of the lands within the conflicting limits of the primary location of the main and branch lines, and that the secretary of the interior correctly construed the forfeiture act of 1890. The selection of the section of land in controversy having been made under such construction and the patents issued to the respondents in conformity therewith, complete title was vested in respondents.

The judgment of the superior court is affirmed.

SCOTT, C. J., and DUNBAR, ANDERS and GORDON, JJ., concur.