## UNITED STATES *v.* BURLINGTON AND MISSOURI RIVER RAILROAD COMPANY.

1. The grant of lands made to the Burlington and Missouri River Railroad Company, by the act of July 2, 1864 (13 Stat. 356), embraced ten odd-numbered sections per mile, to be taken on the line of the road and in equal quantities on each side thereof, which had not been sold, reserved, or otherwise disposed of by the United States, and to which, at the time of the definite location of such line, a pre-emption or a homestead claim had not attached.

2. Lands are, within the meaning of the act, taken on such line when they are selected along its general direction or course, within lines perpendicular to it at each end.

3. The grant was made to aid in the construction of the entire road; but the company, on completing each section of twenty miles, had the privilege to receive a patent for lands opposite thereto.

4. The grant having no lateral limits, and the Land Department having for years neglected to withdraw from market lands situate beyond twenty miles from the road, and the lands opposite to certain portions of it having been patented to other parties, it was *held* that the grant to the company could be satisfied by lands elsewhere situate on the line of the road.

5. By the act of July 1, 1862 (12 Stat. 489), and by said act of 1864, which was an amendment thereof, Congress intended to place the Union Pacific Railroad Company, and all its branch companies, upon the same footing as to lands, privileges, and duties, except where special provision was otherwise made; and the grant having been enlarged as to the sections and the distance from the road within which they should be selected, by striking out the numbers in the first act and substituting larger numbers, the first act must thenceforth be read as against the government and the parties

coming under concurrent or subsequent grants, as though the larger numbers had been originally inserted in it. The Burlington and Missouri River Railroad Company claiming under the act which declared that that of 1862, making the grant to the Union Pacific Railroad Company, should be thus read, must take its right to the lands subject to the claim of the latter company.

6. The Land Department, in executing the act, was not authorized to enlarge the quantity of lands on either side of the road to make up a deficiency on the other. But, at the suit of the United States, patents embracing any alleged excess on one side cannot be adjudged invalid as to any lands which are not identified, so as to be separated from the remainder; nor can any decree be rendered against the company for their value.

APPEAL from the Circuit Court of the United States for the District of Nebraska.

The facts are stated in the opinion of the court.

*Mr. Assistant Attorney-General Smith* for the appellant.
*Mr. J. M. Woolworth* for the appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

This is a suit in equity, brought by the United States to annul certain patents issued by them to the Burlington and Missouri River Railroad Company, for lands situated in Nebraska, amounting in the aggregate to one million two hundred thousand acres. It is founded upon alleged errors made by the Land Department in the construction of the statute under which the patents were issued, and presents several interesting questions for determination. These questions, however, are so fully considered by the presiding justice of the Circuit Court, and the views we entertain are so clearly stated in his opinion, that we can add but little to what he has said.

By the eighteenth section of the act of Congress of July 2, 1864, amending the act of 1862, " to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes," the Burlington and Missouri River Railroad Company, an existing corporation under the laws of Iowa, was authorized to extend its road through the then Territory of Nebraska from the point where it strikes the Missouri River, south of the mouth of the Platte River, to some point not further west than the one hundredth meridian of west longitude, so as to connect by the most

practicable route with the main line of the Union Pacific
road, or with that part of it which runs from Omaha to the
said meridian. By the nineteenth section of the act, there
was granted to the company, for the purpose of aiding in the
construction of this road, every alternate section of public land
(excepting mineral land) designated by odd numbers, to the
amount of ten alternate sections per mile on each side of the
road, on the line thereof, which were not sold, reserved, or
otherwise disposed of by the United States, or to which a pre-
emption or homestead claim had not attached at the time the
line of the road was definitely fixed.

In April, 1869, this railroad company was authorized to
assign and convey to a company to be organized under the laws
of Nebraska, all the rights, powers, and privileges granted to
it by the act of 1864, subject to the same conditions and
requirements. The defendant company was thereafter organ-
ized and incorporated under the laws of Nebraska, with power
to build the railroad mentioned; and to it the Iowa company
made the assignment authorized. The new company there-
upon proceeded to construct the road from Plattsmouth, on the
Missouri River, to Fort Kearney, where it connected with the
road of the Union Pacific, a distance of two hundred miles.
The work was commenced on the 4th of July, 1869, and was
completed on the 2d of September, 1872.

By the twentieth section of the act of 1864, whenever twenty
consecutive miles of the road should be completed in the man-
ner prescribed, the President of the United States was to
appoint three commissioners to examine and report to him in
relation to it; and if it should appear that the twenty miles
were completed as required, then, upon the certificate of the
commissioners to that effect, patents were to be issued to the
company for land on each side of the road to the amount
designated. Such examination, report, and conveyance were
to be made from time to time, until the entire road should be
completed.

In compliance with this provision, as each section of twenty
miles of the road was completed, commissioners were appointed
by the President to examine and report upon it; and upon
their reports patents were issued for land within twenty miles

from the road. But within that distance, on the north and south side, portions of the land, amounting to one million two hundred thousand acres, had been sold, reserved, or otherwise disposed of by the United States, or homestead or pre-emption claims had attached to it at the-time the line of the road was definitely fixed. Thereupon the company made application to the Land Department for land outside of the limit of twenty miles in lieu of the land thus disposed of; and accordingly, in 1872, five patents for such land were issued. It is to annul these patents that the present bill was filed, their validity being called in question on the ground that the act of Congress limited its grant to land within twenty miles of the road.

The line of the road was definitely located in June, 1865, and land embracing the odd sections, within the limit of twenty miles, was withdrawn from sale in July following; but land outside of this limit, which was subsequently patented to the company, was not withdrawn until May, 1872. Between the definite location of the road in 1865 and the withdrawal of the land outside of the twenty-mile limit in 1872, the greater part of the land opposite the eastern sections of the road was disposed of by the government; and therefore most of the land covered by the patents lies opposite the western sections. This constitutes another ground of the alleged invalidity of the patents, it being contended that the grant was to aid in the construction of each section of the twenty miles, taken separately, and that it must be of land directly opposite to such section.

By the act of 1862, the Union Pacific Railroad Company was authorized to construct a railroad from a point on the one hundredth meridian of longitude west of Greenwich to the western boundary of Nevada Territory, the initial point of which was to be fixed by the President. To aid in the construction of this road, a grant was made to the company of five alternate sections of land, designated by odd numbers on each side of the road, along its line within the limit of ten miles. By the same act, the company was also authorized to construct a road from a point on the western boundary of the State of Iowa, to be fixed by the President, to the one hundredth meridian of longitude, upon the same terms and conditions prescribed

for the construction of the Union Pacific line.   By the act of 1864, the grant of five sections was increased to ten sections, and the limit within which they were to be taken was increased from ten to twenty miles.   This enlargement of the grant was not made by the terms of a new and additional grant, but by enacting that the numbers five and ten in the original act should be stricken out, and the numbers ten and twenty substituted in their places.

In March, 1864, the President fixed the initial point of the new road near Omaha, and thereupon the company commenced its construction.   This initial point was distant about twenty miles only from the defendant company's road, and the roads of the two companies ran west on nearly parallel lines, so close that the grants to both could not be satisfied.   The Union Pacific claimed the whole of the odd sections between the ten-mile and the twenty-mile limit, and its claim in this respect was recognized by the Land Department by the issue of patents or certificates for patents for them.   The defendant thereupon selected land more than twenty miles distant from the line of its road, in order to make up the entire number of sections granted to it.   It is now contended by the government that the act of 1864 did not enlarge the grant made in aid of the Omaha branch by the original act, and that the defendant was entitled to the odd sections outside of the ten-mile limit, and could not take land elsewhere in lieu of them ; and that if the act did enlarge the grant, the defendant, having received its grant by the same act, was entitled to one-half of the land within the enlarged limit, and could not therefore take land to that amount elsewhere.   Assuming this construction of the act of 1864 to be correct, these objections are also urged against the validity of the patents.

It also appears by the allegations of the bill that land to the extent of one hundred and fifty thousand acres, which should have been taken, if at all, on the south side of the road, was selected on the north side of the road beyond the twenty-mile limit, and included in the patents to the defendant; and this fact is made an objection to the validity of the patents as to the land thus taken.

Upon the several grounds stated, the United States ask a

decree for the cancellation of the patents, or, if that cannot be granted, a decree that they be declared void as to a portion of the land embraced by them.

The position that the grant to the company was only of land situated within twenty miles of the road, finds no support in the language of the act of Congress: that simply declares that a grant is made of land to the amount of ten sections per mile on each side of the road. The grant is one of quantity, and the selection of the land is subject only to these limitations: 1st, that the land must be embraced by the odd sections; 2d, that it must be taken in equal quantities on each side of the road; 3d, that it must be on the line of the road; and, 4th, that it must not have been sold, reserved, or otherwise disposed of by the United States, and a pre-emption or homestead claim must not have attached to it at the time the line of the road was definitely located. There is here no limitation of distance from the road within which the selection is to be made, and the court can make none. The objection, undoubtedly, has its suggestion from the fact that nearly all, perhaps all, other grants of land in aid of the construction of railroads prescribe a lateral limit within which the land is to be selected; and provide for the selection of land elsewhere to make up any deficiency arising from the disposition of a portion of it within such limit between the date of the act and the location of the road. The reasons for the omission in this case are obvious. The road was to run through a country already partially settled, and likely to be more settled before the line of the road would be definitely located. It was doubtful, therefore, whether any considerable portion of the amount of land intended for the company would be found undisposed of within twenty miles of its road. Moreover, the road of the Union Pacific was to be constructed within a short distance, and its grant would necessarily preclude a selection of land by the defendant if the latter's grant were confined within a similar lateral limit. Congress gave no government bonds to the company: its aid consisted merely in the grant of land; and that this might not fail, it allowed the land to be taken along the line of the road wherever it could be found. And the land was taken along such line in the sense of the statute, when taken along the

general direction or course of the road within lines perpendicular to it at each end. The same terms are used in the grant to the Union Pacific company, in which the lateral limit is twenty miles; and if a section at that distance from the road can be said to be along its line, it is difficult to give any other meaning than this to the language. They certainly do not require the land to be contiguous to the road; and if not contiguous, it is not easy to say at what distance the land to be selected would cease to be along its line.

The position that the grant was in aid of the construction of each section of twenty miles taken separately, and must be limited to land directly opposite to the section, is equally untenable. The grant was to aid in the construction of the entire road, and not merely a portion of it, though the company was not to receive patents for any land except as each twenty miles were completed. The provision allowing it to obtain a patent, then, was intended for its aid. It was not required to take it; it was optional to apply for it then, or to wait until the completion of other sections or of the entire road. The grant was of a quantity of land on each side of the road, the amount being designated at so many sections per mile, with a privilege to receive a patent for land opposite that portion constructed as often as each section of twenty miles was completed. If this privilege were not claimed, the land could be selected along the whole line of the road without reference to any particular section of twenty miles. When lateral limits are assigned to a grant, the land within them must, of course, be exhausted before land for any deficiency can be taken elsewhere. And when no lateral limits are assigned, the Land Department of the government, in supervising the execution of the act of Congress, should, undoubtedly, as a general rule, require the land to be taken opposite to each section; but in some instances good reasons may exist why a selection elsewhere ought to be permitted. If, as in the present case, by its neglect for years to withdraw from sale land beyond twenty miles from the road, the land opposite to any section of the road has been taken up by others and patented to them, there can be no just objection to allowing the grant to the company to be satisfied by land situated elsewhere along the general line of the road.

That the amendment of the act of 1864, enlarging the grant of 1862 to the Union Pacific company, was intended to apply to the grants made to all the branch companies, there can be no doubt.   All the reasons which led to the enlargement of the original grant led to its enlargement to the branches.   It was the intention of Congress, both in the original and in the amendatory act, to place the Union Pacific company and all its branch companies upon the same footing as to land, privileges, and duties to the extent of their respective roads, except when it was otherwise specially stated.   Such has been the uniform construction given to the acts by all departments of the government.   Patents have been issued, bonds given, mortgages executed, and legislation had upon this construction.   This uniform action is as potential, and as conclusive of the soundness of the construction, as if it had been declared by judicial decision.   It cannot at this day be called in question.

Now, the enlargement of the grant by the act of 1864 is not made, as already stated, by words of a new and additional grant, but simply by altering the number of sections granted and the distance from the road within which they are to be taken.   The numbers in the first act, says the amendment, shall be stricken out and larger numbers substituted, so that the act of 1862 must thenceforth be read, at least as against the government and parties claiming under concurrent or subsequent grants, as though the larger numbers had been originally inserted in it.   The Burlington and Missouri Railroad Company received its grant from the same act which declared that the act of 1862 in its grant to the Union Pacific should be thus read: it must, therefore, take its rights to the land subject to the claim of that company.

"This view," as the presiding justice of the Circuit Court justly observes, "would commend itself to Congress by its intrinsic equity, for by it each road gets the largest quantity of land which the statute permits, while the other construction allows the Burlington and Missouri company to get all it could under any circumstances, the other road losing what the latter took within the lap.   This comes out of the fact that the Burlington and Missouri company was not confined within

any lateral limits, while the Union Pacific could not go with out its twenty-mile limit to make up deficiencies." " Besides," he adds, " both of these roads have acquiesced in the construction given and acted on by the United States, the officers of the government having prescribed it as the one which should govern all their rights; the patents have been issued under it for the full amount of all the land which could be so claimed under both grants; and innocent purchasers have, no doubt, become owners of much of the land patented to the Union Pacific company; and it is certainly all mortgaged, so that an incalculable amount of injustice would be done by holding all this void and setting aside the patents."

It only remains to notice the further objection to the patents, that land to the amount of one hundred and fifty thousand acres on the north side of the road is included in them in lieu of land deficient on the south side.    It is true the act of Congress contemplates that one-half of the land granted should be taken on each side of the road; and the department could not enlarge the quantity on one side to make up a deficiency on the other. But the answer to the objection as presented by the bill, either in its original form or as amended, is that it is not shown what this land was, and the patents cannot be adjudged invalid as to any land not identified, so as to be capable of being separated; nor can any decision go against the company for its value without such identification.    It is possible that the land to which the company was entitled is not so described in the patents that it can be separated from that which should not have been patented.    If such be the fact, the government may be without remedy ; it certainly could not insist upon a cancellation of the patents so as to affect innocent purchasers under the patentees. It is sufficient, however, that it makes no case for relief by the present bill.

*Decree affirmed.*