NORTHERN PAC. R. Co. *v.* UNITED STATES *et al.*

*(Circuit Court, D. Minnesota.* October 17, 1888.)

PUBLIC LANDS—NORTHERN PACIFIC GRANT—SECOND INDEMNITY BELT.

Act Cong. July 2, 1864, organizing the Northern Pacific Railroad Company, and granting to it a certain number of alternate sections of land on each side of its line of road, provided that, whenever, prior to the definite location of its line, any of such sections should have been sold or pre-empted, other lands might be selected in lieu thereof, not more than 10 miles beyond the limits of said alternate sections. Resolution of May 31, 1870, provided that in case there should not be, in any state or territory, at the time of the final location of the road, "the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter," the company should be entitled to receive so many alternate sections of land "in such state or territory, within 10 miles on each side of the said road beyond the limits prescribed in said charter, as will make up such deficiency * * * to the amount of the lands that have been granted," etc., "subsequent to the passage of the act of July 2, 1864." *Held,* that the resolution gave the company an additional 10-mile indemnity limit, and was not intended merely to restrict indemnity to losses occurring subsequent to the original act, and to lands situated in the state or territory in which such losses occurred.

In Equity.   On bill and demurrer.

Action by the Northern Pacific Railroad Company against the United States, Peter Johnson, Andrew Johnson, Thomas M. Libby, August Lindbloom, L. M. Fawsette, and C. D. Bush.

*James McNaught,* and *John C. Bullitt, Jr.,* for complainant.

*Kerr & Richardson,* for defendants.

BREWER, J.   The single question in this case is whether the joint resolution of congress of May 31, 1870, gave to the plaintiff an additional 10-mile indemnity limit.   In an opinion filed August 15, 1887, Mr. Secretary Lamar, then secretary of the interior, held that it did not. The recognized ability of the distinguished secretary, now one of the justices of the supreme court, compels a careful consideration of his views and reasons.   The Northern Pacific Railroad Company, complainant herein, was organized by an act of congress of July 2, 1864.   Section 3 of that act provided for a grant of lands to aid in the construction of the road.   So much of that section as is pertinent to the question reads as follows:

"Sec. 3. And be it further enacted that there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights at the time the

line of said railroad is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections, or parts of sections, shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

The first section of the joint resolution of May 31, 1870, is as follows:

"Resolved, by the senate and house of representatives of the United States of America in congress assembled, that the Northern Pacific Railroad Company be, and hereby is, authorized to issue its bonds to aid in the construction and equipment of its road, and to secure the same by mortgage on its property, and rights of property of all kinds and descriptions, real, personal, and mixed, including its franchise as a corporation; and, as proof and notice of its legal execution and effectual delivery, said mortgage shall be filed and recorded in the office of the secretary of the interior; and also to locate and construct under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget sound, via the valley of the Columbia river, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade mountains to Puget sound; and in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within ten miles on each side of the said road, beyond the limits prescribed in said charter, as will make up such deficiency on said main line or branch, except mineral or other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted or otherwise disposed of subsequent to the passage of the act of July 2, 1864; and that twenty-five miles of said main line between its western terminus and the city of Portland, in the state of Oregon, shall be completed by the 1st day of January, *Anno Domini*, eighteen hundred and seventy-two, and forty miles of the remaining portion thereof each year thereafter, until the whole shall be completed between said points: provided, that all the lands hereby granted to said company, which shall not be sold or disposed of, or remain subject to the mortgage by this act authorized, at the expiration of five years after the completion of the entire road, shall be subject to settlement and pre-emption like all other lands, at a price to be paid to said company, not exceeding two dollars and fifty cents per acre; and if the mortgage hereby authorized shall at any time be enforced by foreclosure or other legal proceeding, or the mortgaged lands hereby granted, or any of them, be sold by the trustees to whom such mortgage may be executed, either at its maturity, or for any failure or default of said company under the terms thereof, such lands shall be sold at public sale, at places within the states and territories in which they shall be situate, after not less than sixty days' previous notice, in single sections or sub-divisions thereof, to the highest and best bidder: provided, further, that, in the construction of said railroad, American iron and steel only shall be used, the same to be manufactured from American ores exclusively."

The reasoning of the learned secretary runs along this line; that all government grants are to be construed strictly in favor of the grantor,

and against the grantee; that it is unreasonable to suppose that congress intended to establish two indemnity belts side by side; that the expression "lands granted," found in the resolution as ordinarily used, refers strictly to lands in place, and should therefore be construed as having that meaning here; and that it was the evident intention of congress to simply make definite and certain the place of the selection of indemnity lands, in view of the fact that, in the original act there was no express limitation to the state or territory in which any granted lands might be lost. I quote the language of his opinion:

"A careful consideration of the granting act and the joint resolution irresistibly forces me to the conclusion that congress did not establish another and second indemnity belt, but defined more clearly its purpose in relation to the indemnity provisions to said company, and in doing this repealed the first provision wherein it differs or conflicts with the last; the power to add to, alter, amend, or repeal the granting act being expressly reserved to congress in section 20, *supra*. Section 3 of the granting act shows that indemnity is allowed for lands lost 'prior' to the time of filing the map of definite location. No limit of time is fixed within which the loss must have occurred, only it must have been 'prior' to the definite location, and must have been from the enumerated causes. The joint resolution changed this, and provided that, if at the time of the definite location, any loss was ascertained, indemnity was to be obtained therefor, if it had occurred 'subsequent to the passage of' the granting act, and must be taken in the state or territory where it occurred. If the contention of the company be correct, we would have the extraordinary spectacle of congress establishing side by side two indemnity belts, in one of which selections could be made for losses sustained anywhere, at any time, prior to the definite location of the road; and in the other and furtherest one from the road a belt in which indemnity could be obtained for losses sustained, in the particular state or territory, between the date of this grant and the definite location of the road. The fact is that by its charter the company was prohibited from issuing bonds or mortgages, and was seeking to, and did, have such prohibition removed by the passage of the joint resolution. Though congress had twice extended the time for commencing and completing the road, at that time no work had been done towards the actual building. It was simply a road upon paper. There was, then, no existing reason for an extension of its indemnity limits, and no knowledge that the former were insufficient, but there was reason why, asking a right before denied, congress should then modify, restrict, and make more specific the indemnity provisions, which, as is illustrated by the claim made, were framed in language not as specific as was desired. Hence, in passing the joint resolution, and thereby granting the right to issue bonds and mortgages, the granting power restricted the indemnity to losses occurring between the date of the original act and the date of the definite location, and specified what was before clearly implied, but not said, that the indemnity selections should be restricted to the particular states or territories in which the losses might be sustained. The joint resolution says, if the company cannot get the amount of land granted, within the limits 'prescribed by its charter,' then it shall have lieu lands 'within ten miles on each side of said road beyond the limits prescribed in its charter.' It is very clear to my mind that the limits here referred to are the granted limits prescribed by the charter, so that the indemnity belt spoken of in the joint resolution covers the same lands as in the indemnity limits of the act of 1864. Hence, there is but one indemnity belt, and that for ten miles, just beyond the granted limits, as defined by the map of definite location."

After a careful examination, I am constrained to differ with the learned secretary, and to hold that that resolution did create a second indem-

nity belt, and for these reasons: In the first place, the existence of a second indemnity belt was expressly recognized by the land department in the year after the passage of the resolution in response to an application from the complainant for a withdrawal of lands. Such recognition was unchallenged until the opinion filed in August, 1887, a period of more than 16 years. Lands had been selected and sold in reliance upon such action of the department. The existence of such a belt was during that time accepted without question in the department, and was frequently spoken of in proceedings in congress as an undoubted fact, so that it may fairly be said that contemporary construction running through a period of many years, so far as it is potent, has determined that the resolution of 1870 did create such second indemnity belt. In the case of the *U. S.* v. *Railway Co.*, 98 U. S. 341, the supreme court uses this language:

"It was the intention of congress, both in the original and amendatory act, to place the Union Pacific Company and all its branch companies upon the same footing as to lands, privileges, and duties to the extent of their respective roads, except when it was otherwise specifically stated. Such has been the uniform construction given the acts by all departments of the government. Patents have been issued, bonds given, mortgages executed, and legislation had upon this construction. This uniform action is as potential and as conclusive of the soundness of the construction as if it had been declared by judicial decision. It cannot at this day be called into question."

And in *U. S.* v. *Philbrick*, 120 U. S. 59, 7 Sup. Ct. Rep. 413, it also says:

"A contemporaneous construction by the officers upon whom was imposed the duty of executing these statutes is entitled to great weight; and since it is not clear that that construction was erroneous, it ought not now to be overturned."

See, also, *U. S.* v. *Graham*, 110 U. S. 221, 3 Sup. Ct. Rep. 582; *Railroad Co.* v. *Railroad Co.*, 112 U. S 414, 5 Sup. Ct. Rep. 208, and *The Laura*, 114 U. S. 416, 5 Sup. Ct. Rep. 881.

To similar effect has been the frequent expression of the attorneys general of the United States in their official opinions. I shall not burden this opinion with a citation of these opinions or the various instances in which in the department and in congress the existence of this belt was recognized. Whoever is interested therein will find in the carefully prepared brief of counsel these matters collated. In the second place, when this resolution was pending in congress, it appears from the speeches of those who supported as well as those who opposed, that it was understood by them that the effect of the resolution was to create a second indemnity belt. Extracts from these speeches can also be found in the brief of counsel, but these extracts, like the illustrations above referred to, are too lengthy to be incorporated into any opinion or report. So that we have in support whatever weight may come from contemporary construction, and the express opinions of members of congress in the debate upon the passage of the resolution. But I do not care to rest my conclusion upon these matters. Independent of them it is apparent to my mind that the resolution did provide for such indemnity belt. Though the complainant was chartered in 1864,

up to the time of the passage of this resolution no work had been done in the construction of the road. Twice had the time been extended by congress. In this contingency the complainant applied to congress, by the introduction of a resolution for leave to mortgage its franchise and property, and for the right to make up any loss in the lands in place anywhere on the public lands. The outcome of this application was the resolution as amended and finally passed. While no one doubts the rule that government grants are construed strictly in favor of the grantor, yet such rule does not nullify other well-established rules of statutory construction. Among them is the familiar one that, in the absence of express words of repeal or limitation, a later statute does not repeal by implication an earlier unless there be an absolute inconsistency between them, or unless it be apparent that the legislature was intending a revision of the whole subject-matter. If, by any fair and reasonable construction, force can be given to each, both will stand. It being possible to reconcile two statutes, the one will not repeal the other. Repeals by implication must be by necessary implication. *Wood* v. *U. S.*, 16 Pet. 342. "If it is possible to reconcile two statutes, one will not be repealed by the other." *McCool* v. *Smith*, 1 Black, 459; *U. S.* v. *Tynen*, 11 Wall. 88. "The result of the authorities cited is that, when an affirmative act contains no expression of a purpose to repeal a prior law, it does not repeal it unless the two acts are in irreconcilable conflict, or unless the later statute covers the whole ground occupied by the earlier, and is clearly intended as a substitute for it; and the intention of the legislature to repeal must be clear and manifest." *Red Rock* v. *Henry*, 106 U. S. 601, 1 Sup. Ct. Rep. 434; Sedg. St. & Const. Law, (2d Ed.) 98. Now, the third clause in the resolution, the clause upon which the question depends, contains no express words of repeal or limitation or intention to amend the act of 1864. Therefore, if, with any fair and reasonable construction, force can be given to each, both must stand. Obviously there was no intent to revise the whole subject-matter, for this clause contains no grant of lands, and even with the construction placed by the learned secretary only affects the minor matter of the place of selection of indemnity lands. Again, the lost lands to which the indemnity provision in the act of 1870 applies are not the same as those within the indemnity provision of the original act. That applied to lands disposed of prior to the date of the definite location of the line of the road. This applies to lands disposed of subsequent to the passage of the act of 1864; so that, although some lands might fall within the provisions of both the act and the resolution, yet the test of the right to indemnity lands was different in the two, and the intention of congress was in the resolution obviously directed to a different body of lands than those provided for in the act. Again, notice the opening words of this clause, "and in the event of there not being, [the amount of lands per mile granted by congress to said company,] then said company shall be entitled * * * to receive so many sections," etc. Now, the very form of expression, the train of thought suggested thereby, indicate, not a modification, but an addition, as though something more was being

given rather than a limitation upon what had previously been granted. Further, the second clause in this resolution, which has reference to the location of the road, authorizes the company to "locate and construct under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road," etc. This seems to carry an affirmance of all the rights and grants made by the original act, and before any part of this resolution should be held to modify or restrict such rights and grants the language should be clear. Again, with reference to the suggestion that the expression "lands granted" ordinarily refer in land legislation to lands in place, the truth is, that the expression has a double meaning. Its narrower one is, of course, lands in place; but it is frequently used to include all lands donated by the government, whether lands in place or indemnity lands. *Barney* v. *Railroad Co.*, 24 Fed. Rep. 889; *Railroad Co.* v. *Railroad Co.*, 112 U. S. 730, 5 Sup. Ct. Rep. 334. Indeed, in this very resolution, the words are used in the larger sense. Thus the proviso is "provided, that all lands hereby granted to said company which shall not be sold or disposed of * * * at the expiration of five years, after the completion of the entire road, shall be subject to settlement and pre-emption, like all other lands," etc. Obviously this refers to all the lands which had passed to the company, whether lands in place or indemnity lands. Further, and in the same clause, appears the same word "granted" in manifestly the same sense, so that in the very resolution the words "granted lands" or "lands granted" are used in the larger sense, and it naturally enforces the conviction that they were used in the same broad sense in this clause. Further, as defining the lands, is the expression, "within the limits prescribed by its charter," and as defining the location of the indemnity belt, this expression, "beyond the limits prescribed in such charter." Now, turning to the act of 1864, we find there are two limits provided for,—place limits and indemnity limits. The word "place" must be interpolated before the word "limits" in order to make it express the meaning claimed. Of course it is familiar learning that a word may be interpolated or suppressed if it be necessary to make the language harmonize with the obvious intent of the law-maker. But I know of no rule of construction which permits us to beg the intent, and then interpolate or suppress a word to carry out such intent. Rather is it to be presumed that the very language was used which expresses the intent; and where the phrase is "beyond the limits prescribed in its charter," it is presumed to mean beyond all the limits so prescribed, and if any particular limit had been contemplated, that particular limit would have been named. For these reasons I conclude that the resolution of 1870 did provide for a second indemnity belt. I am happy to add that Judge SLEEPER, judge of the district court of the Fifteenth judicial district of the state of Minnesota, has reached the same conclusion as shown by his opinion, in the case of *Morrison* v. *Benson*. A decree will be entered in favor of the complainant as prayed for.