UNITED STATES *v.* SOUTHERN PAC. R. Co. *et al.*, (three cases.) SAME *v.* COLTON MARBLE AND LIME Co. *et al.*

*(Circuit Court, S. D. California. May 27, 1889.)*

**1. PUBLIC LANDS—DONATIONS—RAILROAD COMPANIES.**

Act Cong. July 27, 1866, granted to the A. & P. Co. every alternate section of public land by odd numbers to the amount of 10 sections on each side of the road wherever it might pass through a state. If any of these sections should be already granted, reserved, etc., before the map of the proposed route should be filed, other odd sections might be selected in lieu thereof within 10 miles on either side of the limits so granted. Whenever and as often as a portion of the road 25 miles long should be completed patents were to issue for the lands so granted, opposite to and coterminous with the portion or portions completed. The odd sections so granted were withdrawn from entry, etc. By section 18 the S. P. Co. was granted the same amount of lands, under similar restrictions, and it was provided that neither the present nor prospective rights of the A. & P. Co. should be thereby impaired. *Held,* that only the odd sections in the strip absolutely granted, and not those in the indemnity strip, were withdrawn from the public domain, and that the A. & P. Co., not having complied with the conditions of the grant, had neither a present nor prospective right to any lands in the last-mentioned strip, which were therefore still subject to grant.

**2. SAME.**

Act Cong. March 3, 1871, granted certain lands to the S. P. Co., to aid it in the construction of a branch line, and provided that if its route, when designated, should be found to be on the line of another road to which land had also been granted, the amount theretofore granted should be deducted from the quantity thereby granted to the S. P. Co. so far as their routes should be on the same general line. The map of the route of the A. & P. Co. was afterwards filed, and the routes of both roads were for some distance on the same general line. The S. P. Co's route included in its 10-mile limit part of the indemnity strip of the A. & P. Co., at points where the A. & P. Co. would have had the right to make selections of lands in lieu of others already taken up. *Held,* that the S. P. Co. acquired no rights as to lands in said indemnity strip so far as the two routes were on the same general line.

**3. SAME—MEXICAN GRANTS.**

Lands claimed to be included in a Mexican grant of a specific boundary, which grant was *sub judice* at the time of the grant of March 3, 1871, were not public land at that date, and did not pass by the grant though they were afterwards held not to be embraced by the Mexican grant.

**4. SAME—RELIEF AGAINST MISTAKE—LIMITATION OF ACTIONS.**

A bill filed by the United States as real and not merely nominal complainant. to repeal patents improperly issued, is not barred by the statute of limitations or by laches.

In Equity.   Bill to repeal patents.

*George J. Denis,* U. S. Dist. Atty., and *Joseph H. Call,* Special Asst.
U. S. Dist. Atty., for complainants.

*Joseph D. Redding, J. D. Bicknell, Anderson, Fitzgerald & Anderson, W.
D. Gould, Edwin Baxter, J. L. Murphey,* and *J. S. Chapman,* for defendants.

Ross, J.   By the bill filed in this case the United States seek to annucertain patents issued by them to the Southern Pacific Railroad Company on March 29, 1876, April 4, 1879, and December 27, 1883, respectively, for lands situated in Los Angeles county, Cal., and to quiet
plaintiffs' alleged title thereto.   To the bill, as amended, demurrers have
been interposed which raise the question of the sufficiency of the matters alleged to entitle the plaintiffs to the relief sought.   The allegations,
in substance, are that congress by an act approved July 27, 1866, entitled "An act granting lands to aid in the construction of a railroad and
telegraph line from the states of Missouri and Arkansas to the Pacific
coast," granted to the Atlantic & Pacific Railroad Company, for the purpose of aiding in the construction of said railroad, etc., "every alternate
section of public land, not mineral, designated by odd numbers, to the
amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the
United States, and ten alternate sections of land per mile on each side
of said railroad whenever it passes through any state, and whenever on the
line thereof the United States have full title, not reserved, sold, granted,
or otherwise appropriated, and free from pre-emption or other claims or
rights at the time the line of said road is designated by a plat thereof
filed in the office of the commissioner of the general land-office, and
whenever prior to said time any of said sections or parts of sections
shall have been granted, sold, reserved, occupied by homestead settlers,
or pre-empted, or otherwise disposed of, other lands shall be selected by
said company in lieu thereof, under the direction of the secretary of the
interior, in alternate sections and designated by odd numbers, not more
than 10 miles beyond the limits of said alternate sections, and not including the reserved numbers: provided, that if said route shall be found
upon the line of any other railroad route, to aid in the construction of
which lands have been heretofore granted by the United States, as far
as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."
That by section 4 of the same act it is provided that whenever said Atlantic & Pacific Company shall have 25 consecutive miles of any portion
of said railroad and telegraph line ready for the service contemplated,
the president shall appoint three commissioners to examine the same,
and if it shall appear that 25 consecutive miles of the road and telegraph line have been completed as required by the act, the commissioners shall so report to the president, and patents shall be issued to said
company, confirming thereto "the right and title to said lands situated
opposite to and coterminous with said completed section of said road;"

and that from time to time, whenever 25 additional consecutive miles shall have been constructed, completed, and in readiness, upon like report patents shall be issued conveying to the company additional sections of the land. That by section 6 of the act it is provided that the president shall cause the lands to be surveyed for 40 miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad, "and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act." That by section 18 of the same act the Southern Pacific Railroad Company was authorized to connect with the said Atlantic & Pacific Railroad at such point near the boundary line of the state of California as they should deem most suitable for a railroad line to San Francisco, and was required to have a uniform guage and rate of freight and fare with the Atlantic & Pacific road, and was given similar grants of land, subject to all the conditions and limitations provided in the act, and was required to construct its road on the like regulations as to time and manner as provided in respect to the Atlantic & Pacific road. It is alleged that the Atlantic & Pacific Company duly accepted the said grant, and proceeded to construct its road, and on or about March 12, 1872, did designate the line of said road by a plat thereof filed in the office of the commissioner of the general land-office, and that all the odd sections on each side of said road for 30 miles were thereupon withdrawn from market and reserved from sale.

The bill, as amended, further alleges that by section 23 of an act of congress approved March 3, 1871, entitled "An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes," it was provided as follows:

"That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions as were granted to said Southern Pacific Railroad Company of California by the act of July 27, 1866: provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company."

The bill, as amended, alleges that the Southern Pacific Company accepted this grant, and on April 3, 1871, did designate the line of its said road by a plat thereof which it on that day filed in the office of the commissioner of the general land-office, and did construct and complete the same in the manner and within the time prescribed, except that it did not connect with the Texas & Pacific Railroad. It is averred that on or about March 29, 1876, April 4, 1879, and December 27, 1883, respectively, the commissioner of the general land-office, without any authority of law therefor, caused certain patents to be signed by the president and by the recorder of the general land-office, and issued the same to the Southern Pacific Railroad Company for certain lands situated in

the county of Los Angeles, state of California, in odd-number sections, within 10 miles of the route of the road of said Southern Pacific Company, as shown by its designated route of location filed in the office of the commissioner of the general land-office pursuant to said act of congress of March 3, 1871, and which said lands are also within 30 miles of, but more than 20 miles from, the line of road of the said Atlantic & Pacific Railroad Company, as designated by its plat filed in the office of the commissioner of the general land-office pursuant to the act of July 27, 1866. The amended bill also avers "that at the time the route of location of said Atlantic & Pacific Railroad was filed, on March 12, 1872, there was within the twenty-mile or primary limits of said road, situated opposite to the tracts described in said pretended patents, a large amount of land which had previous to that time been granted, sold, reserved, and otherwise appropriated, which amounted to more in the aggregate than the amount of the lands described in said pretended patents, but no indemnity land has been selected in lieu thereof by the government or said railroad company;" and that the lands described in the patents have at all times been "agricultural lands, and of greater value than other lands in the indemnity limits of said Atlantic & Pacific Railroad Company," and "have never been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of by the United States, or by the Mexican or Spanish governments, or any other government or authority, in whole or in part, or any estate or interest therein, otherwise than as set forth herein."

It is further averred that on or about March 27, 1837, Ignacio Palomares and Ricardo Vejar presented a petition to Juan B. Alvarado, then governor of Upper California under the Mexican government, for a grant of the place known by the name of "San José." That thereupon, after investigation, such grant was, on April 15, 1837, duly made by Governor Alvarado to said Palomares and Vejar of the place called "San José," in conformity with the plat attached to the petition, and within the boundaries therein expressed. That thereafter, and on or about December 16, 1839, one Louis Arenas and said Ignacio Palomares and Ricardo Vejar presented their petition to the prefect of the district for a grant for the land called "San José," ceded by the decree of April 15, 1837, and one additional league of grazing land. That subsequently, to-wit, March 14, 1840, the then governor of the department of the Californias granted the land so petitioned for to said Arenas, Palomares, and Vejar, and that thereafter said grant was duly approved by the departmental assembly, and juridical possession of said land given to the said grantees. That on or about September, 1852, Henry Dalton, Ignacio Palomares, and Ricardo Vejar each severally filed his claim for confirmation of one-third of the place called "San José," granted as aforesaid, with the board of land commissioners, pursuant to the act of congress of March 3, 1851, entitled "An act to ascertain and settle the private land claims in the state of California," and thereafter, and on or about January 31, 1854, the said board rendered and entered its three several decrees confirming to each of said claimants the land applied for. That on appeal to the

district court, that court at its December term, 1854, rendered its decree in each case, affirming that of the board of land commissioners confirming to Dalton, Palomares, and Vejar an equal undivided one-third each "of the lands of San José, granted by Juan B. Alvarado, governor of California, to Ignacio Palomares and Ricardo Vejar on April 15, 1837, and regranted by said governor on March 14, 1840, to said Palomares and Vejar and to Louis Arenas, as described in the grant first mentioned and the map to which the same refers, and which boundaries fully appear from the act of juridical possession," (described substantially as follows:) "Commencing at the foot of a black walnut tree; thence westerly 9,700 varas to the foot of hills called 'Los Lomas de la Puente,' to a large walnut tree on the slope of a small hill on the side of the road which passes from San José to Puente; thence northerly 10,400 varas to the creek (arroyo) San José, opposite a high hill at a large oak; thence easterly 10,600 varas to the arroyo San Antonio, to two young cottonwood trees; thence southerly 9,700 varas to the place of beginning,"—from which decree there was no appeal, and the same became final. That under the direction and on behalf of the United States surveyor general for California, one George H. Thompson, deputy United States surveyor, did, in August, 1868, so survey and locate the said grant as to include as a part thereof all the lands described in the patents in question, and thereafter, and in the same year, such survey was duly approved by said surveyor general, and the same was then spread upon the records of the general land-office and of the office of said surveyor general. That subsequent to May 1, 1871, the said surveyor general made another survey of said San José grant, upon which the United States did on January 20, 1875, issue its patent to said Dalton, Vejar, and Palomares, which patent was duly accepted by said claimants, and which said patent and final survey did not include any of the lands described in the patents in question, but that all the said lands "were claimed and occupied by said Henry Dalton, Ignacio Palomares, and Ricardo Vejar, their heirs and assigns, as a part of said San José grant, as petitioned for, granted, and confirmed, located and surveyed, from August, 1868, till March 1, 1872." The bill, as amended, also alleges that by the act of congress approved July 6, 1886, entitled "An act to forfeit the lands granted to the Atlantic & Pacific Railroad Company to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific coast, and to restore the same to settlement, and for other purposes," all the lands and rights to lands in California theretofore granted and conferred upon said Atlantic & Pacific Railroad Company were forfeited, resumed, and restored to entry for non-completion of that portion of said railroad to have been constructed in California.

By an amendment to the amended bill it is alleged that the plaintiffs have elected and do elect "to hold, select, reserve, and set apart all the lands in suit herein as a part of said twenty sections per mile granted to said Alantic & Pacific Railroad Company by said act of congress of July 27, 1866, and which were deducted and excluded from said grant to said Southern Pacific Railroad Company on account of said grant to said

Atlantic & Pacific Railroad Company, and also on account of said San José ranch, and the location, claims, and survey thereof;" and further, "that the route of the Southern Pacific Railroad Company as designated by the plat thereof filed in the office of the commissioner of the general land-office as aforesaid, and as located and constructed, is, and it was necessary that it should be, upon the same general line as that of the said Atlantic & Pacific Railroad Company as designated by the plat thereof filed by said company as aforesaid, and all the lands in suit herein are situated opposite to that portion of said routes which are upon the same general line, and are upon the same side of the designated route of the Atlantic & Pacific Railroad Company as the lands for which that company had a right to select indemnity or lieu for prior to July 6, 1886, and which right since that time has been in the United States." Allegations are also made as to the value of the lands in controversy, and in respect to the claims of the defendants thereto. Three other cases, entitled, respectively, *United States* v. *Southern Pacific R. Co. et als.*, (No. 67,) *United States* v. *Southern Pacific R. Co. et als.*, (No. 69,) and *United States* v. *The Colton Marble & Lime Co. et als.*, (No. 88,) were submitted at the same time as the present case and upon the same arguments, and, as they involve substantially the same questions, what is here said will apply to them as well.

While in these cases but a comparatively small amount of land is involved, the suits, it seems from a decision of the secretary of the interior rendered June 23, 1888, and reported in volume 6 of the decisions of the department of the interior, page 816, were instituted by the government to test its right to a large amount of land similarly situated. That decision was made upon an application on the part of the Southern Pacific Railroad Company that it be called on, under the act of congress of March 3, 1887, for a reconveyance of the lands which were held by the land department to have been improperly patented to said company, so that upon a refusal to reconvey, suits might be brought by the government to set aside such patents, and that no further patents should be issued to said company for lands in the limits of the forfeited grant to the Atlantic & Pacific Railroad Company; and also that the then sub sisting withdrawal of lands within the primary grant limit of the Southern Pacific Railroad, (branch line,) which are also within the granted and indemnity limits of the Atlantic & Pacific Railroad, should remain undisturbed until the rights of the Southern Pacific Company could be determined by suits before the courts. The secretary, in deciding upon the application, after dividing the lands covered by the grants into three classes, to-wit: (1) Lands within the common primary limits of the grant to the Atlantic & Pacific Railroad Company and of the grant to the Southern Pacific Railroad Company, (branch line;) (2) lands within the primary limits of the grant to the Southern Pacific Railroad Company, (branch line,) and within the indemnity limits of the grant to the Atlantic & Pacific Railroad Company; (3) lands within the indemnity limits of the grant to the Southern Pacific Railroad Company, (branch line,) and within the primary limits of the grant to the Atlantic & Pacific Railroad Com-

pany,—held that, as to the lands embraced in the first class, as thus divided, for which patents have been issued to the Southern Pacific Railroad Company, suits should be brought to annul them, and that all pending selections of similar lands be canceled, and other unpatented lands within said limits be restored to settlement and entry; and that the request of the railroad company that such lands be held in reservation until the rights of the company thereto could be determined by the courts be denied; the secretary basing his conclusions in that regard upon the decisions of the supreme court in the cases of *Railway Co.* v. *Railway Co.*, 97 U. S. 491, and *Railroad Co.* v. *Railroad Co.*, 112 U. S. 720, 5 Sup. Ct. Rep. 334. In respect to the lands embraced in the third class, the secretary authorized the institution of like proceedings, upon the authority of the supreme court in the cases of *Railroad Co.* v. *Railroad Co.*, 112 U. S. 414, 5 Sup. Ct. Rep. 208, and *Railroad Co.* v. *Railroad Co.*, 117 U. S. 406, 6 Sup. Ct. Rep. 790. In respect to those embraced in the second class, while expressing a doubt whether the reservation of "prospective rights" (of the Atlantic & Pacific Railroad Company) prevented the attachment of the grant of the Southern Pacific Company to lands in place, he did not feel disposed to disturb the ruling made by the department in the cases of *Gordon* v. *Railroad Co.*, 5 Dec. Dep. Int. 691; of *Coble*, 6 Dec. Dep. Int. 679, 812; and of *Voss*, (decided December 10, 1887,)—in which cases it was held that lands within the indemnity limits of the Atlantic & Pacific Railroad Company were excepted from the operation of the grant to the Southern Pacific Company by the proviso to the twenty-third section of the act of March 3, 1871, although said lands fell within the granted limits of the Southern Pacific Railroad, because the Atlantic & Pacific Company had a prospective right of selection of said lands whenever its grant should be located. But in view of the doubt expressed the secretary concurred in the recommendation of the commissioner of the general land-office that the unpatented lands of this class be continued in reservation pending adjudication by the courts, or until such time as the department should deem it proper to remove the reservation. The views of the department in the *Gordon*, *Coble*, and *Voss Cases* were the same as those of the assistant attorney general in the case of *Railroad Co.* v. *Railroad Co.*, 4 Dec. Dep. Int. 215, and were also in accord with those of Attorney General Garland, given in response to a question submitted to him by the secretary of the interior, (6 Dec. Dep. Int. 814.)

The act of July 27, 1866, unlike almost all other grants of land made by congress to aid in the construction of railroads, does not in terms fix a lateral limit within which the land granted is to be taken; but, reading sections 3 and 4 of the act together, and remembering what must never be forgotten in the construction of such grants, that the act is a law as well as a grant, and that effect must be given to the intention of congress in making it, I think a lateral limit of 20 miles is, in effect, fixed within which the lands granted are to be taken, with a provision for the selection of indemnity lands, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of the sec-

tions embraced in the primary grant.    Taking section 3 of the act alone, the grant to the Atlantic & Pacific Company would be precisely like that made by the nineteenth section of the act of July 2, 1864, (13 U. S. St. 364,) to the Burlington & Missouri River Railroad Company, which was under consideration in the case of *U. S.* v. *Railroad Co.*, 98 U. S. 339.    The grant there was of every alternate section of public land (excepting mineral land) designated by odd numbers, to the amount of 10 alternate sections per mile on each side of the road, on the line thereof, which were not sold, reserved, or otherwise disposed of by the United States, or to which a pre-emption or homestead claim had not attached at the time the line of the road was definitely fixed; and one of the positions taken by the government in that case was that the grant to the company was only of land situated within 20 miles of the road; but the court held that the position found no support in the language of the act of congress, which simply declared that a grant is made of land to the amount of 10 sections per mile on each side of the road.    "The grant is one of quantity," said the court, "and the selection of the land is subject only to these limitations: (1) That the land must be embraced by the odd sections; (2) that it must be taken in equal quantities on each side of the road; (3) that it must be on the line of the road; and (4) that it must not have been sold, reserved, or otherwise disposed of by the United States, and a pre-emption or homestead claim must not have attached to it at the time the line of the road was definitely fixed."    In the grant to the Burlington & Missouri River Railroad Company no indemnity was provided for, as is done by the act of July 27, 1866, and the act making the grant to that company, in providing for the issuance of patents for the lands as the sections of road should be completed, did not provide, as does the act of July 27, 1866, for the issuance of such patents confirming to the grantee "the right and title to said land situated opposite to and coterminous with said completed section of said road," but the provision there was that such "patents shall issue conveying the right and title to said lands to said company on each side of said road, as far as the same is completed, to the amount aforesaid."    13 U. S. St. 365.    And in the course of the opinion (98 U. S. 340) the court laid stress upon the fact that the terms of the grant did not require the land to be contiguous to the road, and, if not contiguous, said the court, it is not easy to say at what distance the land to be selected would cease to be along its line.    Nor is it without force that in the grant to the Burlington Company no provision was made for the selection of indemnity lands.    Being simply a grant of quantity, without any limitation as to the distance from the road the land should be taken, there was no need for such a provision.    In the act of July 27, 1866, however, not only is there a provision for the selection of land within extended limits to make up any deficiency arising from the disposition of a portion of the granted land between the date of the act and the location of the road, of which there would have been no need had the grant been intended as one only of quantity; but, as has been seen, the provision contained in section 4 of the act for the

issuance of patents as the sections of road should be completed refers to the land granted as being situated opposite to and coterminous with such completed sections. These considerations, it seems to me, justify the conclusion that the act of July 27, 1866, in effect, although not in terms, fixes a lateral limit of 20 miles on each side of the road within which every alternate section of public land designated by odd numbers is granted, with a provision for the selection of indemnity lands within an extended limit of 10 miles. And although the point does not appear to have been made in any of the cases in which the act of July 27, 1866, was under consideration, the construction above adopted is that which has uniformly been taken by the courts, the land department, and by the only one of the railroad companies that complied with the conditions of the grant, and earned the granted lands.

As appears from the bill the lands in controversy here are situated along and within 20 miles of the line of the road of the Southern Pacific Railroad Company as designated by its plat filed April 3, 1871, and as thereafter actually constructed, and more than 20 miles from, but within 30 miles of, the route of the Atlantic & Pacific Company as designated by its plat filed March 12, 1872. Had they been situated within 20 miles of the designated route of the Atlantic & Pacific Company they would clearly have fallen within the grant to that company, and consequently have been excluded from the subsequent grant to the Southern Pacific Company; for, if the construction above put upon the act of July 27, 1866, be the correct one, every alternate section of public land, designated by odd numbers, within 20 miles of the line of the road, as definitely fixed, would have passed to the Atlantic & Pacific Company as of the date of its grant. *Railroad Co.* v. *Railroad Co.*, 112 U. S. 726, 5 Sup. Ct. Rep. 334; *Railroad Co.* v. *Railroad Co.*, 117 U. S. 408, 6 Sup. Ct. Rep. 790, and cases there cited. It is contended by the government that all public lands designated by odd numbers, and embraced within the indemnity limits of the grant to the Atlantic & Pacific Railroad Company are also excepted from the grant to the Southern Pacific Railway Company by reason of the proviso to the twenty-third section of the act of March 3, 1871, which, as has been seen, reads: "Provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company." The reason why, in grants in which a limit is prescribed, and all the alternate odd or even sections within the limit are granted, title to such sections attaches as of the date of the grant, and why, to lands embraced within the indemnity or lieu limits, no title attaches prior to selection, is that in the one case the land granted becomes ascertained, and consequently the title thereto fixed and perfected, by the location of the line of the road, whereas in the other case, there are no means known to the law by which the lands embraced in the grant can be ascertained prior to their selection. Authorities, *supra*. To lands to which no title could attach prior to selection I do not think the Atlantic & Pacific Company had, at the time of the grant to the Southern Pacific Company, a present or prospective right. If it had

such right to the particular lands in suit it had the same right to all other lands to which the right of selection might have applied.    And since by the act making the grant the Atlantic & Pacific Company was empowered to construct its road along the thirty-fifth parallel of latitude to the Colorado river "at such point as may be selected by said company for crossing, thence by the most practicable and eligible route to the Pacific" ocean, the present and prospective right of that company, prior to selection, might be applied to any public land situated between the Colorado river and the Pacific ocean with equal propriety as to the particular lands in controversy here.    The effect of such a holding would be to give to the proviso as broad a scope as the granting clause to which it is appended.    In other words, to hold that while purporting to make a grant to the Southern Pacific Company to aid in the construction of a railroad from a point at or near Tehachapa pass by way of Los Angeles to the Texas Pacific Railroad at or near the Colorado river, the grant in effect was defeated by the proviso.    While the Atlantic & Pacific Company had, at the time of the grant to the Southern Pacific Company, a clear present and prospective right to all lands embraced within the primary limits of its grant, I am of opinion, for the reasons stated, that it had no right of any nature to any particular piece of land within the indemnity limits prior to its selection; and, as the lands in question here never were selected by that company, but were selected and (except in one case) patented to the Southern Pacific Company under the direction of the land department, that the patents are valid, unless excepted from the grant to the Southern Pacific Company by reason of the alleged facts respecting the Mexican grant San José, or by reason of that provision of the act of July 27, 1866, which declares "that if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."    In the third section of the act of July 27, 1866, is to be found the terms of the grant to the Southern Pacific Company, as well as that to the Atlantic & Pacific Company, since the act of March 3, 1871 refers to section 18 of the act of July 27, 1866, and that in turn to the third section of the same act for the terms of the grant.

In addition to the proviso to which the grant to the Southern Pacific Company was made subject by the act of March 3, 1871, the grant to that company was also made subject to the provision that if the route it was authorized to designate should be found to be upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, "as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."    The grant to the Atlantic & Pacific Company was the prior grant, and the amount of land granted to it was 10 sections per mile on each side of its road when it passes through a state.    This amount, by the provision annexed to the grant to the Southern Pacific Company, is to be

deducted from the grant to that company where the routes are upon the same general line; and, as the grant to the Southern Pacific Company was also 10 sections per mile on each side of its road, it results that no land was granted to the Southern Pacific Company where the routes of the two roads are upon the same general line. The allegations of the bill, which, upon demurrer, are to be taken as true, being that the route of the Southern Pacific Railroad Company as located and constructed is upon the same general line as that of the Atlantic and Pacific Railroad Company, as designated under the act of July 27, 1866, and that all the lands in suit herein are situated opposite to that portion of said routes which are upon the same general line, I am of opinion that in this respect the bill states a good cause of action. I am also of opinion that the allegations in respect to the Mexican grant San José are sufficient, if true, to invalidate the patents. The allegations show that that grant was *sub judice* at the date of the grant to the Southern Pacific Company, to-wit, March 3, 1871, and that the lands in controversy were claimed to be within the boundaries of the Mexican grant up to March 1, 1872. If such was the fact, the lands in controversy were not public lands within the meaning of the grant to the railroad company. *Newhall* v. *Sanger*, 92 U. S. 762; *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228; *U. S.* v. *McLaughlin*, 127 U. S. 428, 8 Sup. Ct. Rep. 1177. It is argued by counsel for some of the defendants that the San José grant was one by specific boundaries, and that, it having been ultimately ascertained by the government that the lands in controversy were not embraced within those boundaries, they were all the time public lands, and therefore subject to the grant to the railroad company. It is for the very reason that the grant was one by specific boundaries, coupled with the alleged fact that the lands in controversy were within the claimed limits of that grant at the time of the grant to the railroad company, that prevents the latter grant from attaching to them. Authorities, *supra*.

But one other point remains to be considered, and that is that the bill shows on its face such laches as that a court of equity should refuse to grant any relief, at least as against those who are purchasers from the railroad company. It is sufficient to say in response to this that the case here is not one in which the government has allowed its name to be used for the sole benefit of a private person, in which event it would be a mere nominal complainant, but here the government is the real party complainant, seeking the enforcement of its own rights, and is therefore not bound by any statute of limitations nor barred by any laches of its officers, however gross. *U. S.* v. *Beebe*, 127 U. S. 338, 8 Sup. Ct. Rep. 1083. It results from these views that the demurrers in each of the cases should be overruled, with leave to the defendants to answer within the usual time. Ordered accordingly.